HELEN W. QUAN, ESQ. (SBN 207361)
ATTORNEY AT LAW
333 W. Garvey Avenue, #B-911
Monterey Park, CA 91754
Telephone: (626) 571-2006
Facsimile: (626) 329-4479
Email: helenwq@aol.com

Attorneys for Plaintiffs,
PAUL LIANG, THE PRINCETON PROJECT, INC.
FANG FANG HO, AND REAL WINNERS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

PAUL LIANG, an individual;
THE PRINCETON PROJECT,
INC., a California corporation;
FANG FANG HO also known as
FANG HO, an individual; REAL
WINNERS, INC., a California
corporation,

        Plaintiffs,

  vs.

KEVIN ROBL, an individual;
PRODUCTION CAPITAL LLC,
a Delaware Limited Liability
Company; IBRAHIM
MOHAMMED, an individual;
FRIENDS OF PRODUCTION
CAPITAL LLC, a Delaware
Limited Liability Company;
REMINGTON CHASE also
known as WILLIAM
WESTWOOD also known as

Case No. 2:22-cv-01430

## __COMPLAINT__

**Count 1:** Violation of Federal Racketeer
    Influenced and Corrupt Organizations
    ("RICO") Sections of Title IX of the
    Organized Crime Control Act of 1970
    18 U. S. C. §§. § 1962(c)) and 1962(d)).
**Count 2:** Fraud & Deceit - Count One;
**Count 3:** Fraud & Deceit - Count Two;
**Count 4:** Fraud & Deceit - Count Three;
**Count 5:** Fraud & Deceit - Count Four;
**Count 6:** Fraudulent Concealment - Count
    One;
**Count 7:** Fraudulent Concealment - Count
    Two;
**Count 8:** Intentional Misrepresentation - Count
    One;
**Count 9:** Intentional Misrepresentation - Count
    Two;
**Count 10:** Fraud in the Offer or Sale of
    Securities - Violation of Section
    17(a)(1) and (3) of the Securities Act;

- 1 –

1  WILLIAM ELIOT, an individual;
   CHRISTOPHER BREMBLE, an
2  individual; BASE MEDIA
   TECHNOLOGY GROUP PTE
3  LTD., a foreign limited liability
   company; BASE FX, a foreign
4  limited liability company;
   DANIEL PETTA, an individual;
5  KEVIN ROBL and ANA ROBL,
6  as Trustees of THE ANA ROBL
   2017 IRREVOCABLE GIFT
7  TRUST; KEVIN ROBL as
   Trustee of THE KEVIN ROBL
8  LIVING TRUST; BURGEE AND
9  ABRAMOFF, a California
   Professional Corporation; BASE
10 FX INTERNATIONAL
   LIMITED, a foreign limited
11 liability company; BASE FX
12 PRODUCTIONS
   SWITZERLAND AG, a foreign
13 business form unknown; BASE
   DIGITAL SERVICES, LIMITED,
14 a foreign limited liability
15 company; CHALET FILMS AG,
   a foreign business form unknown;
16 FRIENDS OF PRODUCTION
   CAPITAL BASE STUDIOS, a
17 business entity form unknown;
18 and DOES 1 through 50,
   inclusive,
19
20        Defendants.
21

**Count 11:** Fraud in Connection with the Purchase or Sale of Securities - Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c);

**Count 12:** Unregistered Offer and Sale of Securities Violation of Sections 5(a) and 5(c) of the Securities Act;

**Count 13:** Violation of Foreign Corrupt Practices Act of 1977 (FCPA) 15 U.S.C. § 78dd-1, et seq.;

**Count 14:** Violation of California's False Advertising Law (California Business and Professions Code § 17500);

**Count 15:** Violation of California Corporate Code §§ 25400 and 25500;

**Count 16:** Violation of California Business and Professions Code §§ 17200 et seq.;

**Count 17:** Negligent Misrepresentation;

**Count 18:** Conversion;

**Count 19:** Constructive Trust;

**Count 20:** Breach of Fiduciary Duty;

**Count 21:** Fraudulent Conveyance;

**Count 22:** Improper Recipient;

**Count 23:** Constructive Fraud;

**Count 24:** Aiding and Abetting;

**Count 25:** Civil Conspiracy;

**Count 26:** Breach of Contract - Count One

**Count 27:** Breach of Contract - Count Two

**Count 28:** Intentional Infliction of Emotional Distress;

**Count 29:** Negligent Infliction of Emotional Distress;

**Count 30:** Temporary and Permanent Injunctive Relief

**Count 31:** Declaratory Relief;

**Count 32:** Piercing Corporate Veil;

**Count 33:** Accounting; and

**Count 34:** Unjust Enrichment.

## DEMAND FOR JURY TRIAL

- 2 –

1    Come now, Plaintiffs PAUL LIANG, THE PRINCETON PROJECT, INC.,

2    FANG FANG HO also known as FANG HO, and REAL WINNERS, INC.,

3    (collectively "Plaintiffs"), by and through undersigned counsel, and hereby file this

4    complaint ("Complaint") against Defendants KEVIN ROBL, PRODUCTION

5    CAPITAL LLC, IBRAHIM MOHAMMED, FRIENDS OF PRODUCTION

6    CAPITAL LLC, REMINGTON CHASE also known as WILLIAM WESTWOOD

7    also known as WILLIAM ELIOT, CHRISTOPHER BREMBLE, BASE MEDIA

8    TECHNOLOGY GROUP PTE LTD., BASE FX, DANIEL PETTA, KEVIN ROBL

9    and ANA ROBL  as Trustees of THE ANA ROBL 2017 IRREVOCABLE GIFT

10   TRUST; KEVIN ROBL as Trustee of THE KEVIN ROBL LIVING TRUST;

11   BURGEE AND ABRAMOFF, BASE FX INTERNATIONAL LIMITED, BASE

12   FX PRODUCTIONS SWITZERLAND AG, BASE DIGITAL SERVICES,

13   LIMITED, CHALET FILMS AG, FRIENDS OF PRODUCTION CAPITAL BASE

14   STUDIOS, and DOES 1 through 50, inclusive (Collectively, "Defendants") allege

15   on knowledge with respect to their own acts and on information and belief with

16   respect to all other matters.

17                               **THE PARTIES**

18       1.    Plaintiff PAUL LIANG ("LIANG") is and, at all times relevant herein,

19   was an individual residing in Los Angeles County, State of California.

20       2.    Plaintiff FANG FANG HO also known as FANG HO ("HO") is and, at

21   all times relevant herein, was an individual residing in Los Angeles County, State of

22   California.

23       3.    Plaintiff THE PRINCETON PROJECT, INC. ("PRINCETON") is and,

24   at all times relevant herein, was a California corporation that has its principal

25   business location in Los Angeles County, State of California.

26       4.    Plaintiff REAL WINNERS, INC. ("WINNERS") is and, at all times

27   relevant herein, was a California corporation that has its principal business location

28

1   in Los Angeles County, State of California.

2        5.    Plaintiffs are informed and believe and thereon allege that Defendant

3   KEVIN ROBL ("ROBL") is and, at all times relevant herein, was an individual

4   residing in Los Angeles County, State of California. ROBL is PRODUCTION

5   CAPITAL LLC's co-founder and current Chief Executive Officer.

6        6.    Plaintiffs are informed and believe and thereon allege that Defendant

7   Ibrahim Mohammed ("MOHAMMED") is an individual residing in the State of

8   California, County of Los Angeles.  MOHAMMED represented himself to be

9   PRODUCTION CAPITAL LLC's co-founder and Chief Financial Officer.

10        7.    Plaintiffs are informed and believe and thereon allege that Defendant

11   REMINGTON CHASE also known as WILLIAM WESTWOOD also known as

12   WILLIAM ELIOT ("CHASE"), at all times relevant herein, was an individual

13   residing in Los Angeles County, State of California, but his whereabouts are now

14   uncertain, and may include Marina del Rey, California, and/or London, England.

15        8.    Plaintiffs are informed and believe and thereon allege that Defendant

16   CHRISTOPHER BREMBLE ("BREMBLE"), at all times relevant herein, was an

17   individual residing in Los Angeles County, State of California, but is now believed

18   to reside in China.

19        9.    Plaintiffs are informed and believe and thereon allege that Defendant

20   DANIEL PETTA ("PETTA"), at all times relevant herein, was an individual

21   residing in Los Angeles County, State of California, but he is now believed to

22   reside in California or South Dakota.

23        10.    Plaintiffs are informed and believe and thereon allege that Defendant

24   PRODUCTION CAPITAL LLC ("PRODUCTION CAPITAL") is a Limited

25   Liability Company organized and existing under the laws of the State of Delaware

26   that regularly conducts business in the State of California.

27        11.    Plaintiffs are informed and believe and thereon allege that Defendant

28

- 4 –

FRIENDS OF PRODUCTION CAPITAL LLC ("FOPC") is a Limited Liability Company organized and existing under the laws of the State of Delaware that regularly conducts business in the State of California.

12.     Plaintiffs are informed and believe and thereon allege that Defendant BASE MEDIA TECHNOLOGY GROUP PTE LTD ("BASE MEDIA"), was and is a foreign limited liability company in Hong Kong that has its business location in Los Angeles County, State of California.

13.     Plaintiffs are informed and believe and thereon allege that Defendant BASE FX ("BASE FX"), was and is a foreign limited liability company in China, has its business location in Los Angeles County, State of California.

14.     Plaintiffs are informed and believe and thereon allege that Defendants KEVIN ROBL and ANA ROBL as Trustees of THE ANA ROBL 2017 IRREVOCABLE GIFT TRUST ("ANA TRUST"), was and is an irrevocable trust that has its investment in Los Angeles County, State of California.

15.     Plaintiffs are informed and believe and thereon allege that Defendant KEVIN ROBL as Trustee of THE KEVIN ROBL LIVING TRUST ("KEVIN TRUST"), was and is an irrevocable trust that has its investment in Los Angeles County, State of California.

16.     Plaintiffs are informed and believe and thereon allege that Defendant BURGEE AND ABRAMOFF ("BURGEE"), was and is a California Professional Corporation that has its business location in Los Angeles County, State of California.

17.     Plaintiffs are informed and believe and thereon allege that Defendant BASE FX INTERNATIONAL LIMITED ("BASE FX INTERNATIONAL"), was and is a foreign limited liability company in Hong Kong, China, that has been doing business in Los Angeles County, State of California.

18.     Plaintiffs are informed and believe and thereon allege that Defendant

- 5 –

BASE FX PRODUCTIONS SWITZERLAND AG ("BASE FX SWITZERLAND"), was and is a foreign business form unknown in Switzerland and has been doing business in Los Angeles County, State of California.  Plaintiffs are informed and believe and thereon allege that BASE FX SWITZERLAND belongs to BASE MEDIA TECHNOLOGY GROUP PTE LTD.

19.     Plaintiffs are informed and believe and thereon allege that Defendant BASE DIGITAL SERVICES, LIMITED ("BASE DIGITAL"), was and is a foreign limited liability company in Hong Kong, China and has been doing business in Los Angeles County, State of California.

20.     Plaintiffs are informed and believe and thereon allege that Defendant CHALET FILMS AG, ("CHALET FILMS"), was and is a foreign business form unknown in Switzerland and has been doing business in Los Angeles County, State of California.

21.     Plaintiffs are informed and believe and thereon allege that Defendant FRIENDS OF PRODUCTION CAPITAL BASE STUDIOS ("FPBS"), was and is a foreign business form unknown in Switzerland and has been doing business in Los Angeles County, State of California.

22.     Plaintiffs do not know the true names and capacities of the Defendants sued herein as Does 1 through 50, and for that reason have sued them by their fictitious names.

23.     Plaintiffs allege that each of these fictitiously named Defendants is responsible in some manner for some or all of the acts alleged herein. Plaintiffs will seek leave from the Court to amend this Complaint when the true names and capacities of the fictitiously-named Defendants have been ascertained.  The true and correct names and capacities, whether individual, corporate, associate or otherwise of Defendants, DOES 1 through 50, inclusive, are unknown to Plaintiffs, who therefore sue these Defendants by such fictitious names.

24.     Specifically, the true and correct names and capacities, whether individual, corporate, associate or otherwise, of Defendants who also committed the wrongful and illegal acts with and/or acted independently from named Defendants, are currently unknown to Plaintiffs.  Plaintiffs will request leave of the Court to insert their true names and capacities when ascertained.

25.     Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named Defendants is responsible in some manner for the injuries hereinafter alleged.

26.     Plaintiffs are informed and believe, and based thereon allege, that Defendants, and each of them, at all times herein mentioned, were the principals, agents, employees, servants, co-venturers, partners, co-conspirators and/or legal representatives of each of the Defendants and that in doing the things herein alleged, Defendants, and each of them, acted within the course and scope of said relationships and with the knowledge, permission, consent, ratification and/or adoption of the other Defendants, and each of them.

## JURISDICTION AND VENUE

27.     Jurisdiction in this Court is proper under 28 U.S.C. § 1331 because certain of the claims asserted herein arise under the laws of the United States. Jurisdiction is also proper because each of the individual Defendants resides in this judicial district, and each Corporate Defendant regularly conducts business in this judicial district. Defendants have also subjected themselves to the jurisdiction of this Court by virtue of their contracts with Plaintiffs.

28.     This Court has personal jurisdiction over Defendants because, among other things, Defendants are doing business in the State of California and in this judicial district, the acts of infringement complained of herein occurred in the State of California and in this judicial district, and Defendants have caused injury to Plaintiffs and their investors in this judicial district.

COMPLAINT AND DEMAND FOR JURY TRIAL

29.     This Court has supplemental jurisdiction over the related state-law claims asserted in this Complaint pursuant to 28 U.S.C. §1367, because they arise from a shared nucleus of operative facts common to the federal causes of action alleged in the Complaint and because the exercise of supplemental jurisdiction serves the interests of judicial economy, convenience and fairness to the parties.

30.     To the extent original jurisdiction does not otherwise exist over any claims in this lawsuit, this Court has supplemental jurisdiction over such claims under 28 U.S.C. § 1367 as they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

31.     Venue in this district is proper pursuant to 28 U.S.C § 1391(b), since some, or all, of the conduct which is the subject of this Complaint occurred in Los Angeles County, State of California, and because the events giving rise to the allegations in this Complaint occurred in this judicial district.

## COMMON ALLEGATIONS

32.     Plaintiffs seek monetary, injunctive, and declaratory relief against Defendants in this action for the wrongful acts committed by Defendants in violation of Federal laws, including the Federal Racketeer Influenced and Corrupt Organizations ("RICO") Sections of Title IX of the Organized Crime Control Act of 1970, 18 U. S. C. §§. § 1962(c) and 1962(d)); Sections 17(a)(1) and (3) of the Securities Act; Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c); and Sections 5(a) and 5(c) of the Securities Act; as well as California laws such as California Corporate Code §§ 25400 and 25500; California's False Advertising Law (California Business and Professions Code § 17500); and California Business and Professions Code §§ 17200 et seq.,

33.     The claims alleged in this Complaint sound in both tort and contract. Plaintiffs have been damaged in an amount no less than approximately

1   $40,737,000.

2   34.     This action involves the ongoing fraudulent activities and unregistered

3   offer and sale of securities perpetrated by Defendants through various affiliated

4   entities that are and were doing business in the United States.  Defendants have

5   engaged in a "pattern of racketeering activity" with at least two predicate criminal

6   acts including, among many others, mail fraud, wire fraud, and financial institution

7   fraud.  Defendants engaged in those criminal acts as separate entities and as joint

8   participants in an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(1),

9   (5).

10  35.     The film financing projects conducted by Defendants were introduced

11  to Plaintiff LIANG in 2016, through a Wells Fargo advisory division's 1st Vice

12  President of Investments, Brandon Hung Ly ("Ly").

13  36.     Ly claimed he acted as a custodian and managed the accounts for

14  Defendant ROBL and CHASE.  Ly acted as a broker for many short-term film

15  projects that were in need of certain bridge loans and investments with attractive

16  return on investment ("ROI") rates.

17  37.     Plaintiff LIANG started to fund these film projects as an investor

18  purchasing short-term pre- and post-production project investments from ROBL

19  and CHASE (the "Securities") through Ly.

20  38.     Thereafter, Ly was terminated by Wells Fargo Bank.

21  39.     After Ly's termination, Plaintiff LIANG started to invest directly with

22  Defendants ROBL and CHASE.

23  40.     Plaintiff LIANG then became one of the investors, who financed

24  ROBL's film projects and started to purchase more Securities from Defendants

25  ROBL and CHASE.

26  41.     Gradually, Plaintiff LIANG also introduced Defendants ROBL and

27  CHASE's Securities to his friends and family.

28

COMPLAINT AND DEMAND FOR JURY TRIAL

42.     Plaintiff HO was introduced to the film financing projects by Plaintiff LIANG in early 2017.  Gradually, Plaintiff HO introduced Defendants ROBL and CHASE's Securities to her friends and family.

43.     Thereafter, Plaintiffs LIANG and HO were induced by Defendants ROBL and CHASE to make hefty investments to fund film projects by purchasing Defendants' Securities.

44.     Defendants ROBL, MOHAMMED, and CHASE are the masterminds behind the film-finance fund-raising scheme, along with their assistant Defendant PETTA, who has aided and abetted the fraud on investors including Plaintiffs.

45.     Defendant BREMBLE presented to Plaintiffs LIANG and HO all the Defendant BASE FX's projects available for investments.  Defendant BREMBLE's representations that the monies would be invested in well-known Defendant BASE FX's projects convinced Plaintiffs that the investments were legitimate and would be profitable.

46.     In order to impress Plaintiffs, Defendant ROBL also presented Plaintiffs LIANG and HO with Defendant BASE FX's company profile including the Base Studio Memorandum May 2018 PowerPoint.

47.     Plaintiffs LIANG and HO were offered Securities related to many investment deals, such as financing independent films, off-budget pre- and post-production, visual-effects financing (Defendant BASE FX's specialty), completion bonds, and equity positions in 4 movies: "Skyfire" (formerly named "Crater," formerly named "Tianhuo"); "Wish Dragon"; "Wish Dragon 2"; and "Lord of the West."

48.     On November 28, 2018, Defendant ROBL, the Senior VP of Business Development of Defendant BASE FX, invited Plaintiff LIANG to visit Malaysia for the filming of Skyfire.  Plaintiff LIANG flew there and physically participated on the sets, further deepening his belief that he was investing in legitimate film

COMPLAINT AND DEMAND FOR JURY TRIAL

1    projects.

2        49.    Defendants ROBL and CHASE also invited Plaintiffs LIANG and HO

3    to BASE studio in China.  Plaintiffs LIANG and HO in turn invited their friends

4    and relatives to the studios as potential investors.  During the visit, using his

5    reputation as a well-known figure at Defendant BASE FX, Defendant BREMBLE

6    assured Plaintiffs LIANG and HO that Defendants ROBL and CHASE were

7    trustworthy persons.  Defendant BREMBLE represented to Plaintiffs LIANG and

8    HO that ROBL and CHASE were his partners.  Based on Defendant BREMBLE's

9    representations, Plaintiffs LIANG and HO's friends and relatives made investments

10   in the Private Placement Memorandum ("PPM") contracts related to film projects

11   that involved Defendant BASE FX.

12       50.    On October 3, 2018, Plaintiffs LIANG and HO also visited Defendant

13   BASE FX in Xiamen, China, to view the development of Wish Dragon.  During the

14   visit, Defendant BREMBLE represented to Plaintiffs LIANG and HO that

15   Defendants ROBL and CHASE both owned Defendant BASE FX shares and much

16   of the funding from Base FX Malaysia came from Defendants ROBL and CHASE.

17   Defendant BREMBLE instructed Plaintiffs LIANG and HO that any

18   communications or deals related to the financing of or investments in BASE FX

19   projects must be conducted through Defendants ROBL and CHASE.

20       51.    On October 10, 2018, via email, Defendants ROBL and CHASE made

21   representations to Plaintiff LIANG related to the film Wish Dragon.  Via the email,

22   they gave Plaintiff LIANG some documents from Sony Pictures ("Sony")

23   projecting that Wish Dragon would have $6 million in worldwide sales.

24       52.    Defendant CHASE presented to Plaintiff LIANG the terms of

25   investment as follows:

26       Terms and Options. A Three week loan for us to purchase the profit

27       participation  points  will  earn  lender  10%  interest.    2%  Profit

28

COMPLAINT AND DEMAND FOR JURY TRIAL

participation points in wish dragon will be divided up equally among the individuals who raise the required funds which is $16,800,000. Example; Raise $8,400,000, receive 1% profit participation. 2) Purchase of profit participation points. 1 % = $480,000, 35 % available. All investors will receive 100% of their capital invested, plus a 20% profit, prior to any non investors receiving any profits in the film (producers, actors etc.) For every 5% of profit participation points purchased, organizer receives 1% profit participation in the film. Plus a cash fee of 4% of investment.

53.     In order to induce Plaintiffs' investments, Defendants ROBL and CHASE represented to Plaintiffs LIANG and HO that they were involved in numerous film productions such as "Aquaman," starring Nicole Kidman; "Mission Impossible," starring Tom Cruise; and "Last Full Measure," starring Mark Wahlberg, among others.

54.     Defendant ROBL also arranged for Plaintiffs LIANG and HO to join the private screening of the Last Full Measure and meet with renowned Hollywood producer Mark Damon and many individuals involved on the sets.

55.     In addition to the Last Full Measure event, Defendants also arranged for Plaintiffs LIANG and HO to attend the following events:

(1) Between 2018 to 2020, Defendants arranged for Plaintiffs LIANG and HO to attend several movie premieres and events at the TCL Chinese Theaters in Hollywood including before the release of "Wish Dragon" starring Jackie Chan and Constance Wu.  Plaintiffs' friends and families were also invited and attended. At the time, Defendants ROBL and CHASE represented to Plaintiffs that they had already aggressively recruited funds for "Wish Dragon 2" and informed Plaintiffs that Defendant PETTA would be the one coordinating all events.

(2) On September 27, 2018, Plaintiffs were invited to Hawthorne Hangar Operations at Air Hangar ("The Hangar"). At the location, Defendant CHASE represented to Plaintiffs that he was the presenter of The Hangar and had access to the private jets, helicopter rides, and other amenities. Defendant CHASE utilized slide projection presentations to impress Plaintiffs and show the camera room with top-of-the-line cameras for aerodynamic photography. Defendants ROBL and CHASE gave Plaintiffs LIANG and HO a tour of The Hangar.  They showed Plaintiffs LIANG and HO the private jets, which Defendant CHASE claimed that he co-owned with Dan Wolfe.  Defendants ROBL and CHASE represented to Plaintiffs LIANG and HO that they used the jets for their commercials and movie purposes, and a helicopter that was used in the movie "Mission Impossible" starring Tom Cruise.  During the tour, Defendants ROBL and CHASE also presented to Plaintiffs LIANG and HO an upcoming animated movie, which they said they were making with BASE FX, called "Wish Dragon" and told Plaintiffs LIANG and HO that they could potentially invest in it.

(3) Defendants ROBL and CHASE also arranged for Plaintiffs LIANG and HO to visit their establishments and activities outside of the Unites States. On January 2, 2019, Plaintiffs LIANG and HO were invited to visit Defendants' operations in Xiamen, China, and they met with some investors.

(4) On March 27, 2019, Plaintiffs were invited to The Hangar again by Defendants ROBL and CHASE to have helicopter rides with other investors, known to Plaintiffs as Gilda, Ginny, and Riki.

(5) On August 15, 2019, Defendants ROBL and CHASE also arranged for Plaintiffs LIANG and HO to visit their establishments and activities in

- 13 –

Kuala Lumpur, Malaysia, the Base Fx Studio excursion (located at Unit M2-1, Level 2, The Vertical, Podium Avenue 3 The Bangsar South City, No 8 Jalan Kerinchi, 59200, Kuala Lumpur).

(6) On August 27, 2019, Defendants ROBL and CHASE also arranged for Plaintiffs LIANG and HO to visit their establishments and activities in Xiamen, China, the Xiamen Base Fx studio headquarters (located at Peak International Plaza Suite 401, #20, Gaoxiong Road, Siming District, Xiamen, Fujian Province, China. Defendants ROBL and CHASE represented to Plaintiffs that their facility had more than 10,000 square feet with over 100 employees working in their graphics and animations departments.  Defendant ROBL represented to Plaintiffs that Base FX has a total of over 500 employees for the whole organization in China. Defendant BREMBLE personally gave Plaintiffs LIANG and HO a tour of this facility.  Defendant BREMBLE represented to Plaintiffs that the voices in the Wish Dragon animation film would be performed by Jackie Chan and Constance Wu.  Plaintiffs LIANG and HO were given private viewing of Wish Dragon.  Defendant BREMBLE further represented to Plaintiffs LIANG and HO that the Wish Dragon will be released in end of 2019.  Furthermore, Defendant BREMBLE said to Plaintiffs and other investors that, for "anything with fundraising talk to Bill [CHASE] and Kevin [ROBL]." Defendants also arranged for Plaintiffs to meet with director Chris Applehans – who gave Plaintiffs LIANG and HO a presentation of Wish Dragon's storyline and the story's origin. Approximately ten of Plaintiffs' personal investors participated in this studio tour, which lasted two days.

(7) On January 10, 2020, Defendants ROBL and CHASE once again arranged for Plaintiffs LIANG and HO to visit their establishments and

COMPLAINT AND DEMAND FOR JURY TRIAL

activities in Kuala Lumpur, Malaysia, the Base Fx Studio excursion (located at Unit M2-1, Level 2, The Vertical, Podium Avenue 3 The Bangsar South City, No 8 Jalan Kerinchi, 59200, Kuala Lumpur).

(8) On March 5, 2020, Defendants ROBL and CHASE also arranged for Plaintiffs LIANG and HO to attend an HBO movie premiere for "WestWorld" held in Hollywood, California.

(9) On February 20, 2020,  Defendants ROBL and CHASE also arranged for Plaintiffs LIANG and HO to the State of Georgia to participate viewing the shooting of the movie "Wally's Wonderland" starring Nicolas Cage. Defendants ROBL and CHASE coordinated the 3 days 2 nights excursion. Defendants ROBL and CHASE also flew another group of the investors, the Kennedy Capital Partners International, Inc., to attend the event in private jets.

(10) On May 15, 2020, Defendants ROBL and CHASE arranged for Plaintiffs LIANG and HO to attend the premiere of "Wish Dragon" at the TCL Chinese Theater.  There were more than 100 attendees, and CHASE acted as the host and emcee of the evening's events.

56.     The above events and arrangements made by Defendants were intended to lure potential investors into purchasing the Securities by demonstrating that Defendants dealt with well-known Hollywood figures.  Based in part on these demonstrations, Plaintiffs believed Defendants' representations and decided to invest in Wish Dragon.  Plaintiffs LIANG and HO were impressed by each of the events that Defendants arranged for them to participate in and were convinced to progressively invest more in Defendants' Securities.

57.     Moreover, Defendant CHASE also represented to Plaintiffs that Dan Wolfe, who owns Wolfe Air Productions and is an expert in capturing aerial shots for movies, was CHASE's business partner, with decades of friendship between

them.

58. In order to coattail on these impressive movie credits and thereby induce Plaintiffs' investments, Defendant CHASE used the word "WE" when he was touting BASE FX's aerial camera work. Defendant CHASE told Plaintiffs that "WE" do most of the air shots seen on TV or in movies; that "WE" do 90% of all the airlines commercials out there; that "WE" own top of the line cameras; and that "WE" are the movie leaders in technology engineering aircraft photography; and similar representations in which he grouped himself in with the well-known successes of BASE FX.

59. During the meetings with investors, Defendant CHASE represented that Kathleen Kennedy, a producer of Star Wars movies, was his childhood friend, and that is the reason why he was able to get Stars Wars visual effects jobs for Defendant BASE FX.

60. In 2018 and 2019, Defendant ROBL represented to Plaintiffs, using documents from Sony, that the investors' funds would be used to finance the post-production of Sony's Wish Dragon film and that Wish Dragon would have a $600 million projection of worldwide sales. Defendant ROBL stated that Wish Dragon equity points participation would also be offered.

61. Moreover, based on Defendant BREMBLE's representations and his operation in Defendant BASE FX, Plaintiffs LIANG and HO were convinced that their investments in the Securities related to the PPM Contracts offered by Defendants ROBL and CHASE were safe.

62. Subsequently, Plaintiffs LIANG and HO started to purchase more and more securities from Defendants and wired the funds pursuant to Defendants' instruction to different entities.

63. As instructed by Defendants, Plaintiffs wired investment funds to the following entities named by Defendant ROBL: (1) PRODUCTION CAPITAL

COMPLAINT AND DEMAND FOR JURY TRIAL

LLC; (2) FRIENDS OF PRODUCTION CAPITAL LLC; (3) FRIENDS OF
PRODUCTION CAPITAL BASE STUDIOS; (4) BASE MEDIA TECHNOLOGY
GROUP LIMITED (Hong Kong); (5) BASE DIGITAL (Hong Kong); (6) BASE
FX PRODUCTIONS SWITZERLAND AG (Switzerland); (7) BASE FX
INTERNATIONAL (Hong Kong).

64.     Plaintiffs LIANG and PRINCETON wired their investment funds to
several Defendant entities as Defendant ROBL instructed: (1) on 7/11/2018,
$289,983.34 to the BURGEE & ABRAMOFF Client Trust Fund; (2) on 2/4/2019,
$340,000 to BASE MEDIA TECHNOLOGY GROUP LTD; (3) on 1/16/2019,
$3,282,500 to BASE MEDIA TECHNOLOGY GROUP LTD; (4) on 6/26/2018,
$300,000 to PRODUCTION CAPITAL LLC; (5) on 12/11/2019, $5,208,000 to
BASE FX PRODUCTION SWITZERLAND AG; (6) on 1/2/2020, $60,000 to
BASE FX PRODUCTIONS SWITZERLAND AG; (7) on 2/27/2020, $190,000 to
BASE FX PRODUCTIONS SWITZERLAND AG; (8) on 3/5/2020, $1,050,000 to
BASE FX INTERNATIONAL LIMITED; (9) on 6/2/2020, $449,980 to BASE FX
PRODUCTIONS SWITZERLAND AG; and (10) on 6/4/2020, $355,000 to BASE
FX INTERNATIONAL LIMITED.

65.     When the Securities purchased by Plaintiffs LIANG and HO matured,
rather than paying the amounts due to Plaintiffs, Defendant ROBL convinced them
to rollover their investments, including ROI, with new short-term contracts with
even more favorable terms.

66.     Then in 2018, the ROI of the Securities with short-term contracts
improved to be 5% to 20% returns in the duration of three (3) to four (4) months.

67.     In order to induce the investments, Defendants presented to Plaintiffs
the following payment schedules: (1) Long Term - Lock in the investment for 12
months PPM; (2) Every end of quarter (3 months), investors would receive
repayment of a 7% ROI of their investment (28% annually); (3) ROBL would

invest these monies in various movies on Plaintiffs behalf within the 12 months term; (4) Short Term - Flat 20%, usually 3-5 months for a bridge loan for "pre-production" or "post-production," or for visual effects production work by BASE FX.

68.     Defendants represented to Plaintiffs that the investment funds would be used to finance movie projects, as in the examples below:

      1)  "Meg 2"

      Starring: Jason Statham

      Start Date: March 19th, 2021

      Repayment Date: Aug 1, 2021

      Work by BASE FX: visual effects, computer generated images, pre-production, Meg design, background underwater scenes, submarine design.

      Investment: $4,477,000

      Return on Investment: 20%

      2)  "Voyagers"

      Starring: Colin Farrell

      Start Date: August 18, 2020

      Repayment Date: On Delivery February 22, 2021

      Work by BASE FX: additional visual effects, computer generated images, post-production

      Investment: $4,721,000

      Return on Investment: 20%

69.     In mid-2018, Defendant ROBL designed a "risk-free" long-term pool of Securities investment funds with a promised 28% ROI per annum to the investors.

70.     Since then, Plaintiff HO has invested her own money and funds from

friends and relatives amounting to $7.5 million. Plaintiff LIANG and his friends and relatives also invested $24 million in the long-term pool.

71.     Unbeknownst to Plaintiffs, Defendants' Securities pool was designed as a Ponzi scheme.  Plaintiffs LIANG and HO and their investors were induced to invest more than $30 million in the long-term pool, and the entire amount of approximately $40,737,000, which includes the principal and the ROI promised by Defendants, is currently in default.

72.     As a result of Defendants' wrongful conduct, Plaintiffs LIANG and HO face possible legal action from their investors.

73.     Defendants repeatedly engaged in a pattern of such racketeering activities.

74.     Defendant ROBL also scammed an entity that Plaintiff LIANG associated with, HollyGold International Co, Ltd, ("HollyGold") for more than $2 million.

75.     Acting on the instructions and representations of Defendant ROBL Plaintiff LIANG caused HollyGold to send approximately $2 million in funds to Defendants BASE FX PRODUCTIONS SWITZERLAND AG and CHALET, believing that the funds would be used for movie projects with an ROI of 20%.  The belief was based on Defendant ROBL's representation that the monies would be invested in BASE FX projects.  However, Defendant ROBL's representation was false.

76.     Defendant ROBL misled and induced Plaintiffs LIANG and HO to introduce the film financing ventures to Plaintiffs' contacts overseas.

77.     Defendant ROBL leveraged Plaintiffs LIANG and HO's roots in Asia and proposed to set up a company comprised of Plaintiffs LIANG and HO as executive directors.

78.     During the period 2018 to early 2020, before the pandemic, Defendant

- 19 –

ROBL and Plaintiffs LIANG and HO would meet up in Asia, China, Hong Kong, Singapore and Malaysia.

79.    In 2019, Defendant ROBL misled Plaintiffs LIANG and HO and indirectly formed an entity called Base Media Capital Singapore Private Limited, in Singapore ("BMCS"), to raise fund for Hollywood movies. Ninety percent of the funds were sent directly to BASE FX PRODUCTIONS SWITZERLAND AG per Defendant ROBL's instruction.

80.    Defendant ROBL claimed that BMCS has raised approximately $7 million, which Defendant ROBL withheld and misappropriated the funds against BMCS and as of today he has not paid up. Repayment was prompt in the beginning, but in late 2019 got delayed, again, all kinds of lies and excuses again and again.

81.    Defendant CHASE covered up for Defendant ROBL, acting as ROBL's front man to deal with the local director, Mr. Stephen Ho, and make excuses for not paying the misappropriated funds. As a result, BMCS is right now in default with bad debt of close to $7 million.

82.    After Plaintiffs LIANG and HO invested in the Securities, they received prompt payments for their investments from 2016 until the third quarter of 2019.  However, payments started to become delayed in 4th quarter of 2019. Payments slowed further and then halted in 2020, followed by no payments at all in 2021.

83.    In 2021, Defendant ROBL claimed that he was approved for a line of credit ("LOC") for $100 million, from which he would repay investors including Plaintiffs.  Defendant ROBL said that he intended to call the notes for all Plaintiffs' PPM and would finance all the movies himself through the LOC.  Defendant ROBL said that he had been working to secure this loan since 2018.

84.    Defendant BREMBLE, banking on his reputation and power in the industry, tried to quell Plaintiffs' concerns by confirming to Plaintiffs on several

1    occasions that he was helping ROBL and was involved in the whole process of

2    getting the LOC.  Based on these representations, Plaintiffs thought that the LOC

3    would at last result in them being fully paid.

4        85.    These representations carried through 2021, repeatedly convincing

5    Plaintiffs LIANG and HO they could expect to receive their repayments soon.  But

6    Defendant ROBL kept putting them off until January 27, 2022, when Plaintiffs

7    finally received a forged and fraudulent bank wire confirmation.  The forged wire

8    confirmation purported to show that the LOC monies were available, but Plaintiffs

9    then realized the LOC had never come through.

10       86.    On January 27, 2022, all Plaintiffs' Securities contracts were due;

11   Plaintiffs then demanded Defendants repay the principal and the promised ROI to

12   all investors, but Defendants did not comply with the demand.

13       87.    As a result, Plaintiff LIANG has since syndicated his friends and

14   relatives' funds to over $40 million between 2016 to 2021 because the amount of

15   Defendants' payments that are in default is added up to be approximately

16   $40,737,000.

17       88.    Based on the three contracts that Plaintiff PRINCETON entered with

18   Defendant ROBL, the unpaid amount is as follows: (1) with FPBS, $12,174,904.11

19   with 28% ROI per annum for a two-year term, 2 x $3,408,973.15 = $6,817,946.30);

20   (2) with BASE FX INTERNATIONAL LIMITED, BASE FX PRODUCTIONS

21   SWITZERLAND AG, and BASE MEDIA TECHNOLOGY GROUP LIMITED,

22   $11,534,463.00 with 28% ROI  per annum, 2 years term, 2 x $3,229,649.64 =

23   $6,459,299.28); (3) with CHALET, (FBO HollyGold International Co. Ltd),

24   $2,070,960.00 (20% ROI per annum, one year term, $414,192). Total outstanding

25   principle is $25,780,327.11. Total outstanding ROI is $13,691,437.60.  Total

26   amount Defendants owe to Plaintiffs LIANG and PRINCETON is approximately

27   $39,417,000.

28

89.     Based on the contractual agreements between Plaintiff WINNERS and Defendant ROBL, the unpaid amount is as follows: (1) BASE DIGITAL SERVICES, LIMITED, $350,000, Due on 3/17/2021 with 20% ROI, $70,000; (2) BASE FX INTERNATIONAL LTD, $150,000, Due on 3/31/2021 with 20% ROI, $30,000; (3) BASE FX INTERNATIONAL LTD, $520,000, Due on 12/31/2021 with 28% ROI per annum, $145,600.  Total outstanding principle is $1,020,000. Total outstanding ROI is $245,600.  Total amount Defendants owe to Plaintiffs HO and WINNERS is $1,265,600.

90.     Defendants collectively are an enterprise engaged in interstate and international commerce whose annual gross volume of sales is not less than $50,000,000.00.

91.     At all times relevant hereto, Defendants, and each of them, were the agents, employees, managing agents, supervisors, co-conspirators, parent corporation, joint employers, alter ego, and/or joint ventures of the other Defendants, and each of them, and in doing the things alleged herein, were acting at least in part within the course and scope of said agency, employment, conspiracy, joint employer, alter ego status, and/or joint venture and with the permission and consent of each of the other Defendants.

92.     Whenever and wherever reference is made in this Complaint to any act or failure to act by a Defendant or co-Defendant, such allegations and references shall also be deemed to mean the acts and/or failures to act by each Defendant acting individually, jointly, and severally.

93.     Defendants PRODUCTION CAPITAL and FOPC are corporations, in essence, incorporated or operated by Defendant ROBL as his alter ego, primarily to circumvent statutes, laws, and government regulations, to accomplish wrongful business practices, to defraud government, and to take advantage of other individuals and entities.

94.     Plaintiffs allege that, at all times herein mentioned, the individual Defendant ROBL being sued herein:

a.  held, and does now hold, substantial, if not all, interest in said corporate Defendants;

b.  dominated, controlled, and influenced, and does now dominate, control, and influence, said corporate Defendants, their officers, their businesses and their properties;

c.  used said corporate Defendants, from their incorporation to the present, as a mere shell and naked framework and conduit for conducting his personal business and/or property affairs, and/or as obligor for the assumption of obligations and/or liabilities incapable of performance by these corporate Defendants, which are in fact the personal obligations and liabilities of said individual Defendant;

d.  created these corporate Defendants pursuant to a scheme, plan and design conceived by said individual Defendant to perpetuate fraudulent acts whereby these corporate Defendants' income, revenue and profits would eventually be funneled to, and converted by, said individual Defendant; and

e.  has such a unity of interest and control between himself and these corporate Defendants such that the individuality and separateness of said corporate Defendants and of said individual Defendant have ceased.

Under these circumstances, adherence to the fiction of the separate existence of said corporate Defendants would improperly sanction inequity and promote injustice.

95.     The purpose of Defendant ROBL's forming of the multiple entities was carried out to defraud government and individuals by concealing his violations of Federal and California laws.

COMPLAINT AND DEMAND FOR JURY TRIAL

96.    With unity of interest and ownership, Defendants collectively formed a dominant group that operates illegal business through mail and wire frauds.

97.    With unity of interest, Defendants were the principals, agents, employees, servants, co-venturers, partners, co-conspirators and/or legal representatives of each of the Defendants and that in doing the things herein alleged, Defendants, and each of them, acted within the course and scope of said relationships and with the knowledge, permission, consent, ratification and/or adoption of the other Defendants, and each of them.

98.    Other than Federal regulations, California recognizes alter-ego relationships, permitting a corporation's liabilities to be imposed on an individual or entity, when two conditions are satisfied: (1) "there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased," and (2) "an adherence to the fiction of the separate existence of the corporation would...sanction a fraud or promote injustice." *Wood v. Elling Corp*., 20 Cal. 3d 353, 365 n.9 (Cal. 1977).

99.    With the unity as alter-ego entities, Defendants, acting in accord, have engaged in the unregistered offering of sale of securities in the form of promissory notes or investment contracts to the general public including Plaintiff and recruited the funds.

100.   With unity of interest, Defendants misused investor funds after raising at least $300 million from more than 100 investors nationwide and overseas, including Plaintiffs.  Defendants have operated a fraudulent scheme whereby Defendants diverted investor money to false entities and misappropriated investor money for their personal use.

101.   In addition to the fraudulent and unregistered offer and sale of securities, Defendants are operating an undisclosed Ponzi scheme through the PPM provided by Defendants, but the repayment funds and the ROI were never

distributed to the investors who invested to the projects.  Instead, by fraudulent concealment, Defendants used the funds recruited from the new investors including Plaintiffs to pay principal and interest to existing investors. Such undisclosed use of investors' funds constitutes a Ponzi scheme.

102.   Since at least 2016, Defendants have targeted small investment groups including Plaintiffs and induced them to invest their funds in promissory notes and investment agreements, offered through individual Defendants' corporate entities and affiliated entities located in several regions worldwide stating attractive ROIs and contractual film deals with Hollywood giants such as Sony Pictures.

103.   Other than the Plaintiffs, Defendants have sold numerous short term post-production project investments, the Securities, to investors nationwide and worldwide. The current value of these investments is at least $300 million, all of which is purportedly under the management and control of Defendants.

104.   To lure investors, Defendants have represented to their investors including Plaintiffs that the Securities as safe, secured, short term, and liquid investments. Specifically, Defendants represent to Plaintiffs and other investors, among other things, that (1) investors' money acquired by the sales of the Securities is pooled to make business loans designated to certain borrowers and are secured by borrowers' assets such as the title and the right to the films; (2) the Securities pay a "guaranteed" return of at least 18% to 80% per annum, which can be paid in cash or allowed to accrue at the investors' discretion; (3) investors will be repaid their principal at maturity, or they may redeem all or part of their investment before maturity subject to a penalty; (4) the investment funds all promised to be loaned to solid Hollywood film makers such as Sony for the protection of investors; and (5) The Defendants ROBL, CHASE, BREMB LE, and MOHAMMED are successful investors in the Securities investment and they are very profitable.

105.   These representations by Defendants were all false.

- 25 –

106.   First, Defendants have not used investor funds to make any secured loans. Defendants have not recorded any UCC-1 financing statements that show any corporate Defendants or any of the individual Defendants as a secured creditor on any loans or investments.

107.   Secondly, Defendants failed to promptly honor redemption requests from investors including Plaintiffs, who have been falsely promised that all their money will be pay back and claimed some are already wired out to the investors. However, even the wiring instructions of the funds wired out through JP Morgan Chase Bank to investors, including Plaintiff, were all forged.

108.   Neither corporate Defendants, nor any of the other Defendants have provided any secured loans to borrowers. No UCC-1 financing statements that identify corporate Defendants, or any of the Defendants as a secured creditor have been filed with the State of California or any other state.

109.   Even if Defendants have used investor funds to make any collateralized loans, the security interests in the collateral have not been perfected under the UCC, and consequently, contrary to Defendants' representations, investors' funds are not secured or protected.

110.   Thirdly, through a team effort, Defendants promoted themselves as being in the business of providing post-production film financing to motion picture companies.

111.   Defendants made high-interest loans to those companies, which allowed them to pay their investors attractive ROIs for the short-term use of their monies.

112.   Defendants only used a relatively small portion of investor funds for their stated purpose, but used the majority of new investor funds for undisclosed purposes, including the satisfaction of obligations owed by other unrelated entities that Defendants controlled and for paying back the matured Securities to the

existing investors.

113.   Defendant diverted some of the investor money to Defendants and other related entities. Some of the diverted money was then dissipated by Defendants.

114.   Some investors including Plaintiffs have been unable to redeem their invested Securities that Defendants and their sales agents have represented to the investors including Plaintiffs that they are in the process of getting paid from the movie makers.

115.   Rather than honoring redemption requests, Defendants have told some investors including Plaintiffs that Defendants will soon get high profit from soon to be released films such as Sony's Wish Dragon, an animation movie.

116.   The statement turned out to be false as Defendants changed the story that because of Covid-19, Sony sold Wish Dragon with a much lower price and therefore, Defendants are unable to repay Plaintiffs because they did not receive the anticipated high profit from Sony.

117.   Since 2016 through present time, there is a pattern and systematic occurrences of the fraudulent activities conducted by Defendants against general public including Plaintiffs and other investors. Many investors including Plaintiffs are victimized by Defendants' Ponzi scheme and racketeer activities.  The schemes are well calculated to defraud Plaintiffs and other investors in similar situations.

118.   Moreover, on September 11, 2020, US Securities and Exchange Commission ("SEC") filed a lawsuit at Central District of California, Case 2:20-cv-08343, against CHASE for his violation of Section 17(a)(1) and (3) of the Securities Act, violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c), and violation of Sections 5(a) and 5(c) of the Securities Act (the "SEC Lawsuit").

119.   Based on information and believe, Plaintiffs allege that CHASE was forced to settle with SEC and agreed to disgorge the funds he unjustly enriched

through his wrongful conducts, paid other payments including civil penalties, and refrained from conducting illegal sales of securities.

120.   Based on information and believe, Plaintiffs allege that as part of the settlement, CHASE consented to refrain from further violation of the SEC acts.

121.   When the SEC Lawsuit broke out, Plaintiffs were very concerned. Plaintiffs and Defendant ROBL had discussed in meetings whether it would affect Plaintiffs' investments and what would be the impact on all investors.  Plaintiffs were concerned about whether the investors' money invested in Defendants' Securities were safe.

122.   Defendant ROBL then represented to Plaintiffs multiple times that all investments were safe and would be fully repaid.  Defendant ROBL explained to the Plaintiffs that they would have nothing to worry because the complaint has no victims, indicating that it was SEC's motives to look for movie producers with deep pockets as target, so they can be penalized with a huge fine. CHASE was fined for more than $9 million, Again, Plaintiffs were being misled by the charismatic and well-placed Defendant ROBL.

123.   However, Defendant ROBL's representations were false. Since April 2021, Defendant ROBL's payments to Plaintiffs are in default. Defendant ROBL gave many different reasons for his delay in repaying.

124.   Despite the fact that the SEC Lawsuit restrained him from conducting further illegal sales of securities, CHASE, along with other Defendants including ROBL, MOHAMMED, and PRODUCTION CAPITAL, continue to use unlicensed sales agents to sell unregistered securities.  Defendants' fraudulent acts are on-going, and they continue to victimize more innocent investors.

125.   Additionally, on October 28, 2021, Hawthorne Hangar Operation, LP ("HHO"), Dan Wolfe, and the Wolfe Family Trust of 1992, who are some other victims defrauded by Defendants, filed a contractual fraud lawsuit against ROBL,

CHASE, and PRODUCTION CAPITAL, in the Superior Court of California, Central District, Case No. 21STCV39700 (the "Hawthorne Lawsuit").

126.   In the Hawthorne Lawsuit, the victims alleged that:

[t]hrough the use of this false resolution and deception as set forth above, Kevin Robl and Remington Chase were able to extract and convert $2,939,616.35 of loan proceeds secured against the Hawthorne Hangar Property to use in connection with their other personal business dealings, having nothing to do with Plaintiff HHO's business. Defendants therefore were able to substantially deplete the equity of the Hawthorne Hangar Property through this fraudulent scheme and deception. ...Dan Wolfe has made repeated requests to have Defendants rectify the above fraud. After being caught, Defendants Kevin Robl and Remington Chase continued to make empty promises that they would refinance all of the loans as contemplated under the MOU at the 2.75 interest rate together with repaying the $2,939,616.35 they stole.

127.   Furthermore, on January 24, 2022, a group of victims including ALTAA Investment, a Delaware Limited Liability Company; 18150 Tiger LLC, a Delaware Limited Liability Company; and Pacific Venture Partners LLC, a Delaware Limited Liability Company filed a RICO lawsuit against Defendants ROBL, MOHAMMED, PRODUCTION CAPITAL, and FOPC in Central District of California, Case 2:22-cv-00498-JFW-MAA (the "ALTAA Lawsuit").

128.   The ALTAA Lawsuit alleges that between 2019 and 2021, the PRODUCTION CAPITAL, and FOPC used a fraudulent movie financing scheme to swindle the ALTAA Group out of over $2.75 million and Defendants ROBL and MOHAMMED were the fraud's masterminds.

129.   The ALTAA Lawsuit also alleges that Defendants ROBL and MOHAMMED founded PRODUCTION CAPITAL for the purpose of fraudulently soliciting investment funds for non-existent movie deals.

130.   Other than the lawsuits that have been filed, there are numerous other investors have been harmed by some of the Defendants.  Based on information and belief, a group of investors, Cambridge Sanarno Capital, invested over $85,000,000

in Defendants' Securities and most of the payments are in default.

131.   As the principal officer and control person of their corporate entities, individual Defendants including Defendants ROBL, MOHAMMED, CHASE, BREMBLE, and PETTA, knew, or should have known, or was reckless in not knowing, that (1) the PPM Securities offering was an apparent Ponzi scheme because the funds recruited from the new investors including Plaintiffs were used to pay principal and interest to existing investors; (2) the Securities were not liquid because Defendants participated in tactics designed to delay investors' liquidations of their accounts; (3) the Securities were not secured and safe because he did not cause UCC-1 financing statements to be filed in order to perfect collateralized loans purportedly made by Defendants; (4) the implication of the scheme from the SEC Lawsuit against CHASE.

132.   Consequently, Defendants violated the securities antifraud provisions of Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

133.   Defendants also failed to register their offering of the Securities, and while Defendant PRODUCTION CAPITAL did file a notice of exemption, however, no exemption for the registration requirements applies. Consequently, Defendants violated the securities registration provisions of Sections 5(a) and 5(c) of the Securities Act.

134.   Defendants, by engaging in the conduct described in this complaint, have violated, and unless enjoined will continue to violate, the securities registration and antifraud provisions of the Securities Act and Exchange Act.

135.   Defendants, by engaging in the conduct described in this complaint, have engaged in a fraudulent scheme in which they raised at least $300 million from the sale of their Securities, by representing to Plaintiffs and other investors that their funds would be used to fund post production of certain film projects, but

1    instead using the majority of investor funds for unrelated business activities, Ponzi
2    scheme paybacks, and for their own benefits.

3        136.   Defendants, by engaging in the conduct described in this complaint,
4    directly or indirectly, in the offer or sale of the Securities, and by the use of means
5    or instruments of transportation or communication in interstate commerce or by use
6    of the mails directly or indirectly, (a) with scienter, employed devices, schemes, or
7    artifices to defraud; and (b) with scienter or negligence, engaged in transactions,
8    practices, or courses of business which operated or would operate as a fraud or
9    deceit upon the purchaser.

10       137.   Defendants, by engaging in the conduct described in this complaint,
11   violated, and unless restrained and enjoined will continue to violate, Sections
12   17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 17(q)(a)(3).

13       138.   Defendants, by engaging in the conduct described in this complaint,
14   engaged in a fraudulent scheme in which they raised at least $300 million from the
15   sale of the Securities, by representing to Plaintiffs and other investors that their
16   funds would be used to fund post production of certain film projects, but instead
17   using the majority of investor funds for unrelated business activities, Ponzi scheme
18   paybacks, and for their own benefits.

19       139.   Defendants, by engaging in the conduct described in this complaint,
20   directly or indirectly, in connection with the purchase or sale of a security, and by
21   the use of means or instrumentalities of interstate commerce, of the mails, or of the
22   facilities of a national securities exchange, with scienter: (a) employed devices,
23   schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of
24   business which operated or would operate as a fraud or deceit upon other persons.

25       140.   Defendants, by engaging in the conduct described in this complaint,
26   violated, and unless restrained and enjoined will continue to violate, Section 10(b)
27   of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c)

28

COMPLAINT AND DEMAND FOR JURY TRIAL

thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

141.   Defendants, by engaging in the conduct described in this complaint, directly or indirectly, offered and sold their Securities in offerings that were not registered with the SEC and that are not subject to a valid exemption to registration.

142.   Defendants, by engaging in the conduct described in this complaint, directly or indirectly, singly and in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

143.   Defendants, by engaging in the conduct described in this complaint, violated, and unless enjoined is reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

144.   Defendants, by engaging in the conduct described in this complaint, directly or indirectly, violated California Corporate Code §§ 25400 and 25500.

145.   Defendants, by engaging in the conduct described in this complaint, directly or indirectly, violated <u>federal and California laws in different aspects of which caused damages to Plaintiffs and other investors.</u>

146.   Defendants, by engaging in the conduct described in this complaint, directly or indirectly, violated California's False Advertising Law (California Business and Professions Code § 17500).

147.   Defendants, by engaging in the conduct described in this complaint, directly or indirectly, violated California Business and Professions Code §§ 17200 et seq.

148.   Defendants, by engaging in the conduct described in this complaint,

made false representations to Plaintiffs. If the false representations were not made intentionally, they were made negligently.

149.   Defendants, by engaging in the conduct described in this complaint, diverted some of the investor money to Defendants and other related entities, and they have obtained Plaintiffs' money in the amount of approximately $40,737,000, retained the funds in their possession and intentional interfere with Plaintiffs' access to the funds.

150.   A constructive trust should be imposed in this action because Defendants, by engaging in the conduct described in this complaint, are trustee of Plaintiffs' investment funds and owed a fiduciary to Plaintiffs.

151.   Plaintiffs also seeks an accounting from Defendants because Plaintiffs are entitled to an accounting to determine what exact sums the Defendants owe to them regarding their funds invested in the Securities that have been recorded in Defendants' accounting books.

152.   Moreover, Plaintiffs seek to pierce through Corporate Defendants' corporate veil and put aside limited liability and hold the Corporate Defendants' shareholders and/or directors liable for all damages caused by the corporate Defendants.

153.   Defendants, by engaging in the conduct described in this complaint, breached the fiduciary duties they owed to Plaintiffs.

154.   Defendants, by engaging in the conduct described in this complaint, fraudulently transferred the funds from one Defendant to another.

155.   Defendants are improper recipients because they are not the proper recipients for the invest funds that were sent to them.

156.   Defendants, by engaging in the conduct described in this complaint, are trustee of Plaintiffs' investment funds, and have a fiduciary duty relationship with Plaintiffs defrauded Plaintiffs' funds. The conducts constitute constructive

fraud.

157.   Defendants, acted in accord, with unity of interest, employed common strategies and practices that were failing to meet the requirements of the California and Federal laws and in fact were in violation of the laws.  Defendants' unlawful business acts are conducted in patterns and are ongoing. Accordingly, injunctive and declaratory relief are appropriate in this action.

158.   These misrepresentations of fact made to Plaintiffs in writing and by telephone are additional predicate acts of mail and wire fraud performed by and in furtherance of the Investment Scheme. Plaintiffs relied on all of these fraudulent representations and omissions to their own detriment and financial injury.

159.   As a direct and proximate result of the Defendants' unlawful racketeering activity, Plaintiffs suffered and continue to suffer damages in an amount to be proven at trial, but of at least approximately $40,737,000.

160.   Plaintiffs and the Defendants are all "persons" as that term is defined in 18 U.S.C. § 1961(3).

161.   Defendants KEVIN ROBL, PRODUCTION CAPITAL LLC, IBRAHIM MOHAMMED, FRIENDS OF PRODUCTION CAPITAL LLC, REMINGTON CHASE also known as WILLIAM WESTWOOD also known as WILLIAM ELIOT, CHRISTOPHER BREMBLE, BASE MEDIA TECHNOLOGY GROUP PTE LTD., BASE FX., DANIEL PETTA, THE ANA ROBL 2017 IRREVOCABLE GIFT TRUST; THE KEVIN ROBL LIVING TRUST; BURGEE AND ABRAMOFF, BASE FX INTERNATIONAL LIMITED, BASE FX PRODUCTIONS SWITZERLAND AG, BASE DIGITAL SERVICES, LIMITED, CHALET FILMS AG, FRIENDS OF PRODUCTION CAPITAL BASE STUDIOS, including all of their employees and agents, formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), the "Investment Scheme."

162.   The Investment Scheme is an ongoing organization consisting of a

variety of legal "persons" that associated for common and shared purposes.

163.   The Defendants coordinated with one another to implement and conceal the Investment Scheme. Each Defendant operated, managed and/or participated in the Investment Scheme, and the Enterprise Defendants worked together to execute the fraud. The Investment Scheme has functioned as a continuing enterprise since at least 2016.

164.   The Defendants communicated with each other using the mail, wires, email, ProtonMail, Zoom, internet teleconferencing, and telephone to manage, operate, and further the Investment Scheme.  This constitutes a pattern of racketeering activity by mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

165.   The Enterprise Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused Plaintiffs to suffer substantial injury because the Enterprise Defendants' pattern of racketeering activity caused Plaintiffs to invest in the Investment Scheme, and caused them to lose over $40 million in investment funds that would not otherwise have been incurred, as alleged herein above.

166.   The Investment Scheme's racketeering activity was fraudulently concealed from Plaintiffs as alleged herein in this Complaint.

167.   Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorney fees.

168.   The Defendants formed agreements to violate 18 U.S.C. § 1962(c). Defendant knew of the Investment Scheme's conspiracy to defraud Plaintiffs and other investors in Production Capital by presenting fraudulent financial records and other information and by offering false investments.

169.   Each Defendant agreed to join this conspiracy, and each agreed to

commit, facilitate, or participate in a pattern of racketeering activity in furtherance of the conspiracy.

170.    Each Defendant agreed to join this conspiracy, and each agreed to do aiding and abetting in a pattern of racketeering activity in furtherance of the conspiracy.

171.    During the conspiracy's existence, each of the Defendants agreed to the commission of an indefinite stream of predicate acts in furtherance of the Investment Scheme.

172.    Defendants agreed to and did commit multiple instances of mail and wire fraud in furtherance of the conspiracy by mailing and wiring fraudulent financial records, deal documents, and other contracts to investors including Plaintiffs. The Defendants also devised the scheme, created and forged certain deal documents, sent fake investment details to Plaintiffs and other investors, and concealed the Investment Scheme from the Plaintiffs in written and oral communications through the mail, email, ProtonMail, Zoom, internet teleconferencing, and telephone.

173.    As a direct and proximate result of the Defendants' unlawful racketeering activity, Plaintiffs suffered and continue to suffer damages in an amount to be proven at trial, but of at least approximately $40,737,000.

174.    Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorney fees.

175.    As a direct and proximate result of the foregoing conduct, Defendants have been unjustly enriched. Plaintiff is entitled to full disgorgement of all profits and the funds obtained by Defendants, and each of them, as a result of their unlawful, unfair, and fraudulent acts as alleged herein.

176.   As a direct and proximate result of the Defendants' breach of their contractual duties alleged in this Complaint, Plaintiffs were harmed by the wrongful conducts in the amount no less than approximately $40,737,000 plus pre-judgment interest.

177.   As a direct and proximate result of the conduct hereinabove alleged, Plaintiffs were harmed by the wrongful conducts in the amount no less than approximately $40,737,000 plus pre-judgment interest.

178.   As a direct and proximate result of the conduct hereinabove alleged, Plaintiffs were harmed by the wrongful conducts, and the Defendants' conducts were willful, wanton, malicious, and fraudulent, and made in conscious disregard of Plaintiffs' rights, and Plaintiffs are thus entitled to an award of punitive and exemplary damages against Defendants.

179.   Other than the tort claims that Plaintiffs claimed against Defendant BASE FX and BASE MEDIA in this action, they are also sued by Plaintiffs under the doctrine of respondeat superior (master and servant relationship) because BASE FX and BASE MEDIA represented to the general public including Plaintiffs that they have master and servant relationship with Defendant ROBL in all relevant time the wrongful acts occurred.

## FIRST CLAIM FOR RELIEF

**Violation of Federal Racketeer Influenced and Corrupt Organizations ("RICO") Sections of Title IX of the Organized Crime Control Act of 1970 18 U. S. C. §§. § 1962(c)) and 1962(d)).**

**(By All Plaintiffs Against All Defendants)**

180.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 179 of this Complaint for all purposes as though fully set forth herein.

181.   Defendants collectively is an enterprise engaged in interstate and international commerce whose annual gross volume of sales is not less than

1    $50,000,000.

2    182.   Corporate Plaintiffs and the Corporate Defendants are all "persons" as

3    that term is defined in 18 U.S.C. § 1961(3).

4    183.   Plaintiffs are informed and believe and thereon allege that Corporate

5    Defendants -- (1) PRODUCTION CAPITAL, (2) FOPC, (3) BASE MEDIA, (4)

6    BASE FX, (5) BASE FX INTERNATIONAL, (6) BASE FX SWITZERLAND, (7)

7    BASE DIGITAL, (8) CHALET FILMS, and (9) FPBS -- and individual Defendants

8    -- (1) ROBL, (2) CHASE, (3) MOHAMMED, (4) BREMBLE, and (5) PETTA --

9    including all of their respective employees and agents, formed an association-in-fact

10   enterprise within the meaning of 18 U.S.C. § 1961(4), the "Investment Scheme"

11   and "Security Fraud" to defraud their investors including Plaintiffs.

12   184.   Defendants also formed agreements with Plaintiffs that are in violation

13   of 18 U.S.C. § 1962(c) because Defendants conspired to defraud investors including

14   Plaintiffs.

15   185.   Defendants' racketeering activity, including but not limited to the

16   following Investment Scheme and Security Fraud, is ongoing.

17   186.   The Investment Scheme and Security Fraud is an ongoing organization

18   consisting of a variety of legal "persons" that associated for common and shared

19   purposes, including but not limited to defraud investors out of their investment

20   funds by intentionally misrepresenting material facts regarding the security of

21   investors including Plaintiffs' investments and the returns of investment in the

22   financial state, the business model, and the investment projects of the following: (1)

23   PRODUCTION CAPITAL, (2) FOPC, (3) BASE MEDIA, (4) BASE FX, (5)

24   BASE FX INTERNATIONAL, (6) BASE FX SWITZERLAND, (7) BASE

25   DIGITAL, (8) CHALET FILMS, and (9) FPBS.

26   187.   The Investment Scheme and Security Fraud is also an ongoing

27   organized Ponzi scheme activity.  Defendants intentionally mislead their investors

28

including Plaintiffs to invest funds into several bank accounts and use new investor funds to pay off existing creditors and/or to pay unrelated persona, business expenses, and personal expenditures/benefits.

188.   Defendants ROBL, CHASE, MOHAMMED, BREMBLE, PETTA, ANA TRUST, KEVIN TRUST, and BURGEE participated in the Scheme and conspired with Corporate Defendants to execute the Scheme.

189.   The Investment Scheme and Security Fraud is an ongoing organization consisting of false advertising presentations regarding the investment projects to lure investors into making investments by providing false assurances regarding the investments and conceal the true risks of the investments.

190.   The Investment Scheme and Security Fraud is an ongoing organization consisting of a scheme to alleviate the disquiets of investors, including Plaintiffs, about their investments by claiming that funds including principles and ROI would all be covered by a $100 million LOC newly acquired by Defendants.  In reality, Defendants had never acquired such a LOC.

191.   The Investment Scheme and Security Fraud is an ongoing organization consisting of a scheme to sell unregistered security instruments that have false value to the investors including Plaintiffs.

192.   The Investment Scheme and Security Fraud is an ongoing organization using the mail and wires to accomplish the Scheme.

193.   The Investment Scheme and Security Fraud is an ongoing organization consisting of interstate and foreign commerce.

194.   In unity, and as alter egos, the Corporate Defendants coordinated and conspired with one another to execute their Investment Scheme and Security Fraud and to defraud investors including Plaintiffs.

195.   Each Defendant agreed to join the Scheme, and each agreed to commit, facilitate, or participate, or aid and abet in a pattern of racketeering activity in

furtherance of the Scheme.

196. Defendants agreed to and did commit multiple instances of mail and wire fraud in furtherance of the Scheme by mailing and wiring fraudulent financial records, deal documents, and other contracts to investors including Plaintiffs.

197. Defendants' pattern of racketeering activity caused Plaintiffs to invest their funds in the Scheme.

198. Plaintiffs relied on Defendants' representations and then made the investments into Defendants' projects by purchasing the unregistered securities.

199. Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused Plaintiffs to suffer damages to be proven at trial, but of at least approximately $40,737,000.

200. As a direct and proximate result of the Enterprise Defendants' unlawful racketeering activity, Plaintiffs suffered and continue to suffer damages in an amount to be proven at trial, but of at least approximately $40,737,000.

201. Under the provisions of 18 U.S.C. § 1964(c), the Enterprise Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorney fees.

202. As a direct and proximate result of the Defendants' unlawful racketeering activity, Plaintiffs suffered and continue to suffer damages in an amount to be proven at trial, but of at least approximately $40,737,000. Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorney fees.

**SECOND CLAIM FOR RELIEF**

**Fraud & Deceit - Count One**

**(By All Plaintiffs Against All Defendants)**

203.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 202 of this Complaint for all purposes as though fully set forth herein.

204.   Through their intentional misrepresentation, Defendants lured Plaintiffs to invest their funds and the funds they raised from their own investors in the Scheme.

205.   The Investment Scheme and Security Fraud is also an ongoing organized a Ponzi scheme activity, Defendants intentionally mislead their investors including Plaintiffs to invest funds into several bank accounts and use new investor funds to pay off existing creditors and/or to pay unrelated persona, business expenses, and personal expenditures/benefits.

206.   The Investment Scheme and Security Fraud is an ongoing organization consisting of false advertising presentation regarding the investment projects to lure investors into making investments by proving false assurance regarding the investments and conceal the true risks of the investments.

207.   The Investment Scheme and Security Fraud is an ongoing organization consisting of a scheme to alleviate investors including Plaintiffs' disquiets about their investments by claiming that funds including principles and ROI would all be paid for by a $100 million LOC newly acquired by Defendants, while the true fact is that Defendants had never acquired such LOC.

208.   The Investment Scheme and Security Fraud is an ongoing organization consisting of a scheme to sell unregistered security instruments that have false value to the investors including Plaintiffs.

209.   The Investment Scheme and Security Fraud is an ongoing organization consisting of the mail and wires to accomplish the Scheme.

210.   The Investment Scheme and Security Fraud is an ongoing organization consisting of interstate and foreign commerce.

211.   In unity, and with alter ego situation, the Corporate Defendants

COMPLAINT AND DEMAND FOR JURY TRIAL

coordinated and conspired with one another to execute their Investment and Security Scheme and to defraud investors including Plaintiffs.

212.    Each Defendant agreed to join the Scheme, and each agreed to commit, facilitate, or participate, or aid and abet in a pattern of racketeering activity in furtherance of the Scheme.

213.    Defendants agreed to and did commit multiple instances of mail and wire fraud in furtherance of the Scheme by mailing and wiring fraudulent financial records, deal documents, and other contracts to investors including Plaintiffs.

214.    Defendants' pattern of racketeering activity caused Plaintiffs to invest their funds in the Scheme.

215.    Plaintiffs relied on Defendants' representations and then made the investments into Defendants' projects by purchasing the unregistered securities.

216.    Defendants' fraudulent conducts directly and proximately caused Plaintiffs to suffer damages will be proven at trial but in no event less than approximately $40,737,000.

217.    The Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorney fees.

## THIRD CLAIM FOR RELIEF

### Fraud & Deceit - Count Two

### (By All Plaintiffs Against Defendants ROBL and CHASE)

218.    Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 217 of this Complaint for all purposes as though fully set forth herein.

219.    In order to induce Plaintiffs' investments, Defendants ROBL and CHASE presented to Plaintiffs LIANG and HO that they were involved in numerous film productions such as "Aquaman," starring Nicole Kidman; "Mission Impossible," starring Tom Cruise; and "Last Full Measure," starring Mark

- 42 –

Wahlberg, among others.

220. Defendant ROBL also arranged for Plaintiffs LIANG and HO to join the private screening of the "Last Full Measure" and meet with Mark Damon and many other individuals involved on the set.

221. The events and arrangements made by Defendants showed that Defendants also employed the Hollywood big name figures to attract investors into purchase the Securities. In fact, Plaintiffs actually believed in Defendants' representations and presentation and decided to invest in Wish Dragon. Plaintiffs LIANG and HO were impressed by each of the events that Defendants arranged them to participate and were convinced to do more investments progressively in Defendants' Securities.

222. Moreover, Defendant CHASE also represented to Plaintiffs that Mr. Dan Wolfe, who owns Wolfe Air Productions and is an expert in capturing aerial shots for movies, was CHASE's business partner, with decades of friendship between them.

223. In order to coattail on these impressive movie credits and thereby induce Plaintiffs' investments, Defendant CHASE used the word "WE" when he was touting BASE FX's aerial camera work. Defendant CHASE told Plaintiffs that "WE" do most of the air shots seen on TV or in movies; that "WE" do 90% of all the airlines commercials out there; that "WE" own top of the line cameras; and that "WE" are the movie leaders in technology engineering aircraft photography; and similar representations in which he grouped himself in with the well-known successes of BASE FX.

224. During the meetings with investors, Defendant CHASE represented that Kathleen Kennedy, a producer of Star Wars movies, was his childhood friend, and that is the reason why he was able to get Stars Wars visual effects jobs for Defendant BASE FX.

225.   In 2018 and 2019, Defendant ROBL represented to Plaintiffs, using documents from Sony, that the investors' funds would be used to finance the post-production of Sony's Wish Dragon film and that Wish Dragon would have a $600 million projection of worldwide sales.  Defendant ROBL stated that Wish Dragon equity points participation would also be offered.

226.   Moreover, based on Defendant BREMBLE's representations and his operation in BASE FX, Plaintiffs LIANG and HO were convinced that their investments in the Securities related to the PPM Contracts offered by Defendants ROBL and CHASE were safe.

227.   Subsequently, Plaintiffs LIANG and HO started to purchase more and more securities from Defendants and wired the funds pursuant to Defendants' instruction to different entities.

228.   Plaintiffs relied on Defendants' presentation and therefore, believed that the funds that they intended to invest in Defendants' Securities would be safe.

229.   At the time the representations were made, Defendants knew or should have known they were false, the agreements were fraudulent in nature.

230.   Plaintiffs relied on Defendants' representations and then made the investments into Defendants' projects by purchasing the unregistered securities.

231.   Defendants jointly defrauded Plaintiffs of approximately $40,737,000.

232.   Defendants' fraudulent conducts directly and proximately caused Plaintiff HO to suffer damages will be proven at trial but in no event less than approximately $40,737,000.

233.   The Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorney fees.

## FOURTH CLAIM FOR RELIEF

### Fraud & Deceit - Count Three

**(By All Plaintiffs Against Defendants ROBL and PETTA)**

234.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 233 of this Complaint for all purposes as though fully set forth herein.

235.   After defrauding Plaintiffs' investment funds and upon Plaintiffs' demand for the return of the funds, Defendant ROBL gave countless excuses for repayments and promised with specific dates to make the payments, but he never fulfilled his promise. In order to make Plaintiffs to believe that they are able to repay Plaintiffs the investment funds and ROI, Defendants informed Plaintiffs that they have already acquired a LOC and they would use the LOC funds to repay Plaintiffs' investment funds and ROI.

236.   Defendant ROBL assured Plaintiffs again and again that he had a LOC of $100 million and that the LOC had already cleared the bank and Plaintiffs will receive them for sure.

237.   According to Defendant ROBL, the LOC funds were cleared from his bank account in JP Morgan Chase Bank on Thursday, January 20, 2022.  However, Plaintiffs did not receive the funds in their bank accounts.  Defendant ROBL reassured Plaintiffs that they will receive the funds on Monday January 24, 2022. Again, the funds did not come to Plaintiffs' bank account.  Therefore, Plaintiffs LIANG and HO confronted Defendant ROBL on January 24, 2022, and requested him to provide explanations.

238.   On January 25, 2022, Plaintiffs LIANG and HO received a text message from Defendant ROBL, reading "Funds will be available tomorrow morning, so let's wait for one more day till tomorrow."

239.   However, Plaintiffs LIANG and HO did not receive any funds on January 26, 2022.  Therefore, on January 26, 2022, Plaintiffs demanded to meet with Defendant ROBL at the bank together to ensure the funds are truly available to Plaintiffs.  Defendant ROBL gave instructions to Plaintiffs LIANG and HO to meet

at his bank, which is the JP Morgan Chase Bank located at the corner of Sunset Boulevard and Vine Avenue in Hollywood, California.  Defendant ROBL also said that they would meet with his banker Omar.  However, Defendant ROBL never showed up.  Plaintiffs LIANG and HO then inquired about the matter with Defendant PETTA, who did not respond.

240.   It turned out that the LOC itself was and is a fraudulent scheme.

241.   Plaintiffs relied on Defendants' representations and then made the investments into Defendants' projects by purchasing the unregistered securities.

242.   Defendants' fraudulent conducts directly and proximately caused Plaintiffs to suffer damages will be proven at trial but in no event less than approximately $40,737,000.

243.   Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorney fees.

**FIFTH CLAIM FOR RELIEF**

**Fraud & Deceit - Count Four**

**(By All Plaintiffs Against Defendants ROBL and PETTA)**

244.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 243 of this Complaint for all purposes as though fully set forth herein.

245.   After defrauding Plaintiffs of their investment funds and upon Plaintiffs' demand for the return of the funds, Defendant ROBL gave countless excuses for repayments and promised with specific dates to make the payments, but he never fulfilled his promise.

246.   Defendant ROBL promised that "This Friday, everyone gets paid….", "Next Monday…", "Tomorrow…", etc.  Defendant ROBL has procrastinated countless times and none of his promises came true.

247.   Defendant ROBL also came up with some stories to fool investors as

delay tactic such as, "Sony needs two signatures to release funds", "Sony has discrepancy of accounting with Tencent causing the delays", "Base Media is waiting for Wish Dragon to release on Netflix and long period of waiting," or "some executive of Sony got covid-19", etc.  Because all the stories did not add up, Plaintiffs became more and more suspicious.

248.   After Plaintiffs made numerous demands for payments and facing the threat of legal actions from investors, on January 14, 2022, Defendant ROBL claimed that he had issued a wire confirmation of $425,000 wired out from his bank account in JP Morgan Chase Bank to Plaintiff WINNERS bank account and to Plaintiff LIANG's investors in the amount of $400,000 and $1.08 million, respectively. These payments were for a portion of the entire principle and ROI.

249.   However, none of the funds purportedly wired out by Defendant ROBL were ever received by Plaintiffs.

250.   It was Defendant ROBL's assistant, Defendant PETTA, who carried out these wires and followed up with Plaintiffs, and he confirmed he sent the said wired out payments.  Defendant PETTA represented to Plaintiffs that they should have received the funds wired out by him.

251.   However, Defendant PETTA's representations were false. During the period of January 15, 2022, to January 26, 2022, Plaintiffs' banks did not receive the funds.  Plaintiffs contacted Defendant ROBL, and they were informed by Defendant ROBL that the money would clear the bank by "tomorrow."

252.   Defendant ROBL assured Plaintiffs again and again that he had a LOC of $100 million and the LOC had already cleared the bank and Plaintiffs will receive them for sure.

253.   According to Defendant ROBL, the LOC funds were cleared from his bank account in JP Morgan Chase Bank on Thursday, January 20, 2022.  However, Plaintiff did not receive the funds in their bank accounts.  Defendant ROBL

reassured Plaintiffs that they will receive the funds on Monday January 24, 2022. Again, the funds did not come to Plaintiffs' bank account. Therefore, Plaintiffs LIANG and HO confronted Defendant ROBL on January 24, 2022 and requested him to provide explanations.

254. On January 25, 2022, Plaintiffs LIANG and HO received a text message from Defendant ROBL, the text said that "Funds will be available tomorrow morning, so let's wait for one more day till tomorrow."

255. However, Plaintiffs LIANG and HO did not receive any funds on January 26, 2022. Therefore, on January 26, 2022, Plaintiffs demanded to meet with Defendant ROBL at the bank together to ensure the funds are truly available to Plaintiffs. Defendant ROBL gave instructions to Plaintiffs LIANG and HO to meet at his bank, which is the JP Morgan Chase Bank located at the corner of Sunset Boulevard and Vine Avenue in Hollywood. Defendant ROBL also said that they will meet with his banker Omar. However, Defendant ROBL never showed up. Plaintiffs LIANG and HO then inquired the matter with Defendant PETTA, he did not respond.

256. Plaintiffs relied on Defendants' representations and then made the investments into Defendants' projects by purchasing the unregistered securities.

257. Defendants' fraudulent conducts directly and proximately caused Plaintiffs to suffer damages will be proven at trial but in no event less than approximately $40,737,000.

258. The Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorney fees

### SIXTH CLAIM FOR RELIEF

### Fraudulent Concealment - Count One

**(By All Plaintiffs HO and WINNERS Against Defendants ROBL, BREMBLE, BASE MEDIA, and BASE FX)**

259.    Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 258 of this Complaint for all purposes as though fully set forth herein.

260.    By concealing the true facts, Defendants induced investors including Plaintiffs HO and WINNERS to invest their funds to Defendants projects by using investment agreements that were offered by Defendant BASE MEDIA and the agreements were signed by BASE MEDIA's CEO Defendant BREMBLE and its VP Defendant ROBL.

261.    On December 16, 2020, January 1, 2021, and March 17, 2021, Defendant ROBL presented Plaintiffs HO and WINNERS three separate investment agreements in the total amount of $1,020,000 that were offered by Defendant BASE MEDIA as securities and were signed by Defendant BASE MEDIA's CEO Defendant BREMBLE and its VP Defendant ROBL.

262.    However, Defendant BREMBLE now claimed that his signatures on the agreements were forged and denied investors including Plaintiff HO and WINNERS' requests for repayment and profit share based on the agreements.

263.    At the time the representations were made, Defendants ROBL and BREMBLE knew or should have known they were false, the agreements were fraudulent in nature.

264.    Plaintiffs relied on Defendants' representations and then made the investments into Defendants' projects by purchasing the unregistered securities by paying the $1,020,000 to Defendants.

265.    Defendants ROBL and BREMBLE jointly employed the Base Media agreements to defraud Plaintiffs HO and WINNERS $1,020,000.

266.    Defendants' fraudulent conducts directly and proximately caused Plaintiffs HO and WINNERS to suffer damages will be proven at trial but in no

1  event less than $1,020,000.

2      267.   Based on the contractual agreements between Plaintiff WINNERS and

3  Defendant ROBL, the unpaid amount is as follows: (1) BASE DIGITAL

4  SERVICES, LIMITED, $350,000, due on 3/17/2021 with 20% ROI, $70,000; (2)

5  BASE FX INTERNATIONAL LTD, $150,000, due on 3/31/2021 with 20% ROI,

6  $30,000; and (3) BASE FX INTERNATIONAL LTD, $520,000, due on

7  12/31/2021 with 28% ROI per annum, $145,600.  Total outstanding principle is

8  $1,020,000. Total outstanding ROI is $245,600.  Total amount Defendants owe to

9  Plaintiffs HO and WINNERS is $1,265,600.

10      268.   Defendants are jointly and severally liable to Plaintiffs for three times

11  the damages that Plaintiffs have suffered, plus the costs of bringing this suit,

12  including reasonable attorney fees.

13  **SEVENTH CLAIM FOR RELIEF**

14  **Fraudulent Concealment -  Count Two**

15  **(By All Plaintiffs LIANG and PRICESTON Against Defendants ROBL,**

16  **BREMBL, BASE MEDIA, and BASE FX)**

17      269.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1

18  through 268 of this Complaint for all purposes as though fully set forth herein.

19      270.   By concealing the true facts, Defendants induced investors including

20  Plaintiffs HO and WINNERS to invest their funds to Defendants projects by using

21  investment agreement that were offered by Defendant BASE MEDIA and the

22  agreements were signed by Defendant BASE MEDIA's CEO Defendant

23  BREMBLE and its VP Defendant ROBL.

24      271.   On December 16, 2020, January 1, 2021, and March 17, 2021,

25  Defendant ROBL presented Plaintiffs HO and WINNERS three separate investment

26  agreements in the total amount of $100,020,000 that were offered by Defendant

27  BASE MEDIA as securities and were signed by Defendant BASE MEDIA's CEO

28

Defendant BREMBLE and its VP Defendant ROBL.

272.   However, Defendant BREMBLE now claimed that his signatures on the agreements were forged and denied investors including Plaintiffs HO and WINNERS' requests for repayment and profit share based on the agreements.

273.   At the time the representations were made, Defendants ROBL and BREMBLE knew or should have known they were false, the agreements were fraudulent in nature.

274.   Plaintiffs relied on Defendants' representations and then made the investments into Defendants' projects by purchasing the unregistered securities by paying the $100,020,000 to Defendants.

275.   Defendants ROBL and BREMBLE jointly employed the Base Media agreements to defraud Plaintiffs HO and WINNERS $100,020,000.

276.   Defendants' fraudulent conducts directly and proximately caused Plaintiffs HO and WINNERS to suffer damages will be proven at trial but in no event less than $100,020,000.

277.   Based on the contractual agreements between Plaintiff WINNERS and Defendant ROBL, the unpaid amount is as follows: (1) BASE DIGITAL SERVICES, LIMITED, $350,000, due on 3/17/2021 with 20% ROI, $70,000; (2) BASE FX INTERNATIONAL LTD, $150,000, due on 3/31/2021 with 20% ROI, $30,000; and (3) BASE FX INTERNATIONAL LTD, $520,000, due on 12/31/2021 with 28% ROI per annum, $145,600.  Total outstanding principle is $1,020,000. Total outstanding ROI is $245,600.  Total amount Defendants owe to Plaintiffs HO and WINNERS is $1,265,600.

278.   The Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorney fees.

### EIGHTH CLAIM FOR RELIEF

**Intentional Misrepresentation Count One**

**(By All Plaintiffs Against All Defendants)**

279.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 278 of this Complaint for all purposes as though fully set forth herein.

280.   In 2018 and 2019, Defendant ROBL represented to Plaintiffs, using documents from Sony, that the investors' funds would be used to finance the post-production of Sony's Wish Dragon film and that Wish Dragon would have a $600 million projection of worldwide sales.  Defendant ROBL stated that Wish Dragon equity points participation would also be offered.

281.   Moreover, based on Defendant BREMBLE's representation and his operation in Defendant BASE FX, Plaintiffs LIANG and HO were convinced that their investments in the Securities related to the PPM Contracts offered by Defendants ROBL and CHASE are safe.

282.   Subsequently, Plaintiffs LIANG and HO started to purchase more and more securities from Defendants and wired the funds to various entities as Defendants instructed.

283.   At the time the representations were made, Defendants knew or should have known that the representations were false.

284.   Plaintiffs relied on the representations and made the investment by purchasing Defendants' Securities.

285.   Defendants' fraudulent conducts directly and proximately caused Plaintiffs to suffer damages will be proven at trial but in no event less than approximately $40,737,000.

286.   The Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorney fees.

**NINTH CLAIM FOR RELIEF**

**Intentional Misrepresentation - Count Two**

**(By All Plaintiffs Against All Defendants)**

287.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 286 of this Complaint for all purposes as though fully set forth herein.

288.   While Defendants induced investors to invest their funds to Defendants projects by purchasing the Securities and the investment agreement that were offered by Defendant BASE MEDIA and the agreements were signed by Defendant BASE MEDIA's CEO Defendant BREMBLE.

289.   As instructed by Defendants, Plaintiffs wired investment funds to the following entities named by Defendant ROBL: (1) PRODUCTION CAPITAL LLC; (2) FRIENDS OF PRODUCTION CAPITAL LLC; (3) FRIENDS OF PRODUCTION CAPITAL BASE STUDIOS; (4) BASE MEDIA TECHNOLOGY GROUP LIMITED (Hong Kong); (5) BASE DIGITAL (Hong Kong); (6) BASE FX PRODUCTIONS SWITZERLAND AG (Switzerland); (7) BASE FX INTERNATIONAL (Hong Kong).

290.   When the funds were wired out to the above seven (7) entities, Plaintiffs truly believed that the funds were invested in the projects pursuant to the terms of the Securities that they purchased from the Defendants.

291.   Unbeknownst to Plaintiffs, the funds were not sent to the projects, but were sent to the recipients for unknown purposes  Defendants conceal the facts against Plaintiffs.

292.   At the time, the representations were made, Defendants knew or should have known that the representations were false.

293.   Plaintiff relied on the representations and made the investment by purchasing Defendants' Securities and wired out to the above seven (7) entities and were damaged by Defendants' false representations.

294.   Defendants' fraudulent conducts directly and proximately caused

COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs to suffer damages will be proven at trial but in no event less than approximately $40,737,000.

295.   The Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorney fees.

## TENTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities –

### Violation of Section 17(a)(1) and (3) of the Securities Act

### (By All Plaintiffs Against Defendants BREMBLE, PRODUCTION CAPITAL, ROBL, MOHAMMED, CHASE, PETTA, and FOPC)

296.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 295 of this Complaint for all purposes as though fully set forth herein.

297.   Based on Defendants' representation that the investors to invest their funds to Defendants projects by purchasing the Securities and the investment agreement were highly profitable and lawful, Plaintiffs purchased the said securities that were offered by Defendant BASE MEDIA and the agreements were signed by Defendant BASE MEDIA's CEO Defendant BREMBLE and its Vice President Defendant ROBL.

298.   Plaintiffs relied on Defendants' representations and then made the investments into Defendants' projects by purchasing the unregistered securities.

299.   It turned out that the Defendants misrepresented Plaintiffs that the sale of the security is lawful and induced them to invest their funds to Defendants projects by purchasing the Securities and the investment agreement that were offered by Defendant itself is a fraudulent scheme.

300.   As instructed by Defendants, Plaintiffs wired investment funds to the following Defendant entities named by Defendant ROBL: (1) PRODUCTION CAPITAL LLC; (2) FRIENDS OF PRODUCTION CAPITAL LLC; (3) FRIENDS

OF PRODUCTION CAPITAL BASE STUDIOS; (4) BASE MEDIA TECHNOLOGY GROUP LIMITED (Hong Kong); (5) BASE DIGITAL (Hong Kong); (6) BASE FX PRODUCTIONS SWITZERLAND AG (Switzerland); (7) BASE FX INTERNATIONAL (Hong Kong).

301.   When the funds were wired out to the above seven (7) entities, Plaintiffs truly believed that the funds were invested in the projects pursuant to the terms of the Securities that they purchased from the Defendants.

302.   Unbeknownst to Plaintiffs, the funds were not sent to the projects, but were sent to the recipients for unknown purposes  Defendants conceal the facts against Plaintiffs.

303.   At the time, the representations were made, Defendants knew or should have known that the representations were false.

304.   Plaintiffs relied on the representations and made the investment by purchasing Defendants' Securities and wired out to the above seven (7) entities and were damaged by Defendants' false representations.

305.   Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

306.   No registration statement has been filed with the Commission or has been in effect with respect to the offerings alleged herein.

307.   By engaging in the conduct described above, each of the Defendants violated and, unless restrained and enjoined, will continue to violate Section 17(a)(1) and (3) of the Securities Act.

308.   Defendants' fraudulent conducts directly and proximately caused Plaintiffs to suffer damages will be proven at trial but in no event less than

1  approximately $40,737,000.

2  309.   The Defendants are jointly and severally liable to Plaintiffs for three

3  times the damages that Plaintiffs have suffered, plus the costs of bringing this suit,

4  including reasonable attorney fees.

5  **ELEVENTH CLAIM FOR RELIEF**

6  **Fraud in Connection with the Purchase or Sale of Securities Violations of**

7  **Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)**

8  **(By All Plaintiffs Against All Defendants)**

9  310.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1

10  through 309 of this Complaint for all purposes as though fully set forth herein.

11  311.   The Defendants, and each of them, by engaging in the conduct

12  described above, directly or indirectly, in connection with the purchase or sale of a

13  security, by the use of means or instrumentalities of interstate commerce, of the

14  mails, or of the facilities of a national securities exchange, with scienter: (a)

15  employed devices, schemes, or artifices to defraud; (b) made untrue statements of a

16  material fact or omitted to state a material fact necessary in order to make the

17  statements made, in the light of the circumstances under which they were made, not

18  misleading; or (c) engaged in acts, practices, or courses of business which operated

19  or would operate as a fraud or deceit upon other persons.

20  312.   By engaging in the conduct described above, each of the Defendants

21  violated, and unless restrained and enjoined will continue to violate, Section 10(b)

22  of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §

23  240.10b-5.123.

24  **TWELFTH CLAIM FOR RELIEF**

25  **Unregistered Offer and Sale of Securities - Violation of Sections 5(a) and 5(c)**

26  **of the Securities Act**

27  **(By All Plaintiffs Against All Defendants)**

28

COMPLAINT AND DEMAND FOR JURY TRIAL

313.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 312 of this Complaint for all purposes as though fully set forth herein.

314.   The Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

315.   No registration statement has been filed with the Commission or been in effect with respect to the offerings alleged herein.

316.   By engaging in the conduct described above, each of the Defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

### THIRTEENTH CLAIM FOR RELIEF
### Fraudulent Concealment Count Three
### (By All Plaintiffs Against All Defendants)

317.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 316 of this Complaint for all purposes as though fully set forth herein.

318.   In addition to the fraudulent and unregistered offer and sale of securities, Defendants are operating an undisclosed Ponzi scheme through the PPM provided by Defendants, but the repayment funds and the ROI were never distributed to the investors who invested in the projects.  Instead, by fraudulent concealment, Defendants used the funds recruited from the new investors including Plaintiffs to pay principal and interest to existing investors.  Such undisclosed use of investors' funds constitutes a Ponzi scheme.

319.   Since at least 2016, Defendants have targeted small investment groups including Plaintiffs and induced them to invest their funds in promissory notes and investment agreements, offered through individual Defendants' corporate entities

and affiliated entities located in several regions worldwide stating attractive ROIs and contractual film deals with Hollywood giants such as Sony Pictures.

320.   Other than the Plaintiffs, Defendants have sold numerous short-term post-production project investments, the Securities, to investors nationwide and worldwide.  The current value of these investments is at least $300 million, all of which is purportedly under the management and control of Defendants.

321.   To lure investors, Defendants have represented to their investors including Plaintiffs that the Securities as safe, secured, short term, and liquid investments. Specifically, Defendants represented to Plaintiffs and other investors, among other things, that (1) investors' money acquired by the sales of the Securities would be pooled to make business loans designated to certain borrowers and were secured by borrowers' assets such as the title and the right to the films; (2) the Securities would pay a "guaranteed" return of at least 18% to 80% per annum, which could be paid in cash or allowed to accrue at the investors' discretion; (3) investors would be repaid their principal at maturity; (4) the investment funds would be loaned to solid Hollywood film makers such as Sony for the protection of investors; and (5) the Defendants ROBL, CHASE, BREMBLE, and MOHAMMED were successful investors in the Securities and they were very profitable.

322.   These representations made by Defendants were and are all false.

323.   At the time the representations were made, Defendants knew or should have known that the representations were false.

324.   Plaintiffs relied on the representations and made the investment by purchasing Defendants' Securities and wired out to the above seven (7) entities and were damaged by Defendants' false representations.

325.   Defendants' fraudulent conducts directly and proximately caused Plaintiffs to suffer damages will be proven at trial but in no event less than approximately $40,737,000.

COMPLAINT AND DEMAND FOR JURY TRIAL

326.   The Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorney fees.

### FOURTEENTH CLAIM FOR RELIEF

**Violation of California's False Advertising Law (California Business and Professions Code § 17500)**

**(By All Plaintiffs Against Defendants ROBL and MOHAMMED)**

327.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 326 of this Complaint for all purposes as though fully set forth herein.

328.   To lure investors, through social media and online presentation in advertisement format, Defendants have represented to the public as their potential investors including Plaintiffs that the Securities as safe, secured, short term, and liquid investments.  The sales pitch included that the Defendants ROBL and MOHAMMED are successful investors in the Securities investment and they are very profitable.

329.   These representations made by Defendants were and are all false.

330.   At the time, the advertisements were made, Defendants knew or should have known that their representations were false.

331.   The false representations that Defendants made through social media and online presentation are in violation of California Professions Code §17500.

332.   Plaintiffs relied on the representations and made the investment by purchasing Defendants' Securities and wired out to the above seven (7) entities and were damaged by Defendants' false representations.

### FIFTEENTH CLAIM FOR RELIEF

**Violation of California Corporate Code §§ 25400 and 25500**

**(By All Plaintiffs Against Defendants PRODUCTION CAPITAL, ROBL, MOHAMMED, CHASE, PETTA, and FOPC)**

- 59 –

333.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 332 of this Complaint for all purposes as though fully set forth herein.

334.   Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

335.   No registration statement has been filed with the Commission or has been in effect with respect to the offerings alleged herein.

336.   By engaging in the conduct described above, each of the Defendants violated, and unless restrained and enjoined will continue to violate Corporate Code §§ 25400 and 25500.

## SIXTEENTH CLAIM FOR RELIEF

### Violation of California Business and Professions Code §§ 17200 et seq.

### (By All Plaintiffs Against Defendants PRODUCTION CAPITAL, ROBL, MOHAMMED, CHASE, PETTA, and FOPC)

337.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 336 of this Complaint for all purposes as though fully set forth herein.

338.   Plaintiffs are informed and believe and therefore allege that Defendants' business activities were and are in violations of Federal and California laws.

339.   California Business and Professions Code §17200 prohibits businesses from engaging in "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," and was designed to protect competitors and consumers from illegal, fraudulent and "unfair" business practices.

340.   Defendants, and each of them, have engaged in fraudulent, unfair and deceptive business behavior and knowingly misrepresented material information.

341.   As described herein, Defendants' activities also constitute unfair business practices in violation of Cal. Bus. & Prof. Code §§ 17200 et seq., because Cross-Defendants' practices violate the above noted laws, and/or violate an established public policy and/or the practice is immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiffs and the public.

342.   As a result of their unlawful acts, Defendants have reaped and continue to reap unfair benefits and unlawful profits at the expense of Plaintiffs.

343.   As a direct and proximate result of the unfair business practices of Defendants, and each of them, Plaintiffs are entitled to equitable including full restitution and/or disgorgement of all benefits they have been unlawfully withheld from Plaintiffs as a result of the business acts and practices described herein.

344.   The predicate act violations which serve as the basis for this UCL claim relate to the fraudulent acts of Defendants.

345.   As a direct and legal result of Defendants' willful, malicious and unfair conduct to Plaintiffs, Plaintiffs have suffered and continues to suffer damages in a sum according to proof.

**SEVENTEENTH CLAIM FOR RELIEF**

**Negligent Misrepresentation**

**(By All Plaintiffs Against All Defendants)**

346.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 345 of this Complaint for all purposes as though fully set forth herein.

347.   In 2018 and 2019, all Defendants, by and through Defendant ROBL represented to Plaintiffs, using documents from Sony, that the investors' funds would be used to finance the post-production of Sony's Wish Dragon film and that Wish Dragon would have a $600 million projection of worldwide sales.  Defendant ROBL stated that Wish Dragon equity points participation would also be offered.

348.   Moreover, based on Defendant BREMBLE's representation and his

- 61 –

operation in Defendant BASE FX, Plaintiffs LIANG and HO were convinced that their investments in the Securities related to the PPM Contracts offered by Defendants ROBL and CHASE are safe.

349.   Subsequently, Plaintiffs LIANG and HO started to purchase more and more securities from Defendants and wired the funds pursuant to Defendants' instruction to different entities.

350.   At the time, the representations were made, Defendants knew or should have known that the representations were false.

351.   Plaintiffs relied on the representations and made the investment by purchasing Defendants' Securities.

352.   While Defendants induced investors to invest their funds to Defendants projects by purchasing the Securities and the investment agreements that were offered by Defendant BASE MEDIA and the agreements were signed by Defendant BASE MEDIA's CEO Defendant BREMBLE and its VP Defendant ROBL.

353.   As instructed by Defendants, Plaintiffs wired investment funds to the following Defendant entities named by Defendant ROBL: (1) PRODUCTION CAPITAL LLC; (2) FRIENDS OF PRODUCTION CAPITAL LLC; (3) FRIENDS OF PRODUCTION CAPITAL BASE STUDIOS; (4) BASE MEDIA TECHNOLOGY GROUP LIMITED (Hong Kong); (5) BASE DIGITAL (Hong Kong); (6) BASE FX PRODUCTIONS SWITZERLAND AG (Switzerland); (7) BASE FX INTERNATIONAL (Hong Kong).

354.   When the funds were wired out to the above seven (7) entities, Plaintiffs truly believed that the funds were invested in the projects pursuant to the terms of the Securities that they purchased from the Defendants.

355.   Unbeknownst to Plaintiffs, the funds were not sent to the projects, but were sent to the recipients for unknown purposes  Defendants conceal the facts against Plaintiffs.

COMPLAINT AND DEMAND FOR JURY TRIAL

356.   At the time, the representations were made, Defendants knew or should have known that the representations were false.

357.   Plaintiffs relied on the representations and made the investment by purchasing Defendants' Securities and wired out to the above seven (7) entities and were damaged by Defendants' false representations.

358.   The wrongful conducts of Defendants if were not done intentionally, they were done neglect.

359.   Defendants' wrongful conducts directly and proximately caused Plaintiffs to suffer damages will be proven at trial but in no event less than approximately $40,737,000.

## EIGHTEENTH CLAIM FOR RELIEF

### Conversion

### (By All Plaintiffs Against All Defendants)

360.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 359 of this Complaint for all purposes as though fully set forth herein.

361.   Plaintiffs had invested into the Security and earned the ROI in the amount of $40,737,000.

362.   Plaintiffs owned and had a right to possess the money that they invested into the Securities for their benefits.  Defendants only holding the funds as the trustees for Plaintiffs during the investment periods. After the date of maturity, Plaintiffs had a right to recover and redeem their full investment plus their ROI.

363.   Defendants, and each of them, substantially interfered with Plaintiffs' property by intentionally withholding the money against Plaintiffs and have prevented Plaintiffs from having access to their investment funds.

364.   Moreover, Plaintiffs did not consent to have their money held by Defendants and made numerous demands to Defendants, but Defendants failed to returned the funds to Plaintiffs.

COMPLAINT AND DEMAND FOR JURY TRIAL

365.   As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs have suffered damages in the amount of $40,737,000 plus pre-judgment interest.

366.   Due to the fraudulent conducts, the Defendants are jointly and severally liable to Plaintiffs for the punitive damages, plus the costs of bringing this suit, including reasonable attorney fees.

## NINETEENTH CLAIM FOR RELIEF

### Constructive Trust

### (By All Plaintiffs Against All Defendants)

367.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 366 of this Complaint for all purposes as though fully set forth herein.'

368.   A trustee owes a fiduciary duty to the beneficiaries of the trust.

369.   Plaintiffs seek imposition of a constructive trust against Defendants because (1) Plaintiffs have interest in the funds they invested in Defendants' film projects by purchasing Defendants' Securities and Agreements with the ROI in the amount of approximately $40,737,000 (the existence of res); (2) Plaintiffs the right to the approximately $40,737,000  that they invested in (right to the res) ; and (3) Defendants wrongfully acquired Plaintiffs' approximately $40,737,000 investment funds and detained the funds that they are not entitled to against Plaintiffs (acquisition or detention of the res by another party who is not entitled to it).

## TWENTIETH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (By All Plaintiffs Against Defendants PRODUCTION CAPITAL, ROBL, MOHAMMED, CHASE, PETTA, BREMBLE, BASE MEDIA, and FOPC)

370.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 369 of this Complaint for all purposes as though fully set forth herein.

371.   As venture partners based on the Security Plaintiffs purchased from

- 64 –

1  Defendants and the profit share greements that Plaintiffs entered with Defendants ,

2  Defendants owe a fiduciary duty to Plaintiffs.

3       372.   As alleged herein, Defendants breached the fiduciary duties they owed

4  to Plaintiffs by (1) luring Plaintiffs to invest their funds to the misrepresented film

5  projects; (2) selling their unregistered Securities to Plaintiffs; and (3) operating a

6  Ponzi Scheme to defraud Plaintiffs.

7       373.   As a direct and proximate result of the wrongful conduct of

8  Defendants, Plaintiffs have suffered damages in the amount of approximately

9  $40,737,000 plus pre-judgment interest.

10      374.   Due to the fraudulent conducts, the Defendants are jointly and

11  severally liable to Plaintiffs for the punitive damages, plus the costs of bringing this

12  suit, including reasonable attorney fees.

13                   **TWENTY - FIRST CLAIM FOR RELIEF**

14                        **Fraudulent Conveyance**

15     **(By All Plaintiffs Against Defendants ROBL, MOHAMMED, CHASE,**

16     **BREMBLE, PETTA, PRODUCTION CAPITAL, FOPC, BASE MEDIA,**

17     **BASE FX, BASE FX INTERNATIONAL, BASE FX SWITZERLAND, BASE**

18               **DIGITAL, CHALET FILMS, and FPBS)**

19      375.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1

20  through 374 of this Complaint for all purposes as though fully set forth herein.

21      376.   With fraudulent intent, through a well calculated scheme, Defendants

22  ROBL, MOHAMMED, CHASE, BREMBLE, and PETTA, fraudulently transferred

23  Plaintiffs' funds that were intended to be invested in legitimate film projects to

24  Defendants PRODUCTION CAPITAL, FOPC, BASE MEDIA, BASE FX, BASE

25  FX INTERNATIONAL, BASE FX SWITZERLAND, BASE DIGITAL, CHALET

26  FILMS, and FPBS.

27      377.   Plaintiffs LIANG and PRICETON wired out funds to several entity

28

Defendants based on Defendant ROBL's instructions.

378.    More specifically, Plaintiffs LIANG and PRINCETON wired their investment funds to the following entity Defendants as Defendant ROBL instructed: (1) on 7/11/2018, $289,983.34 to the BURGEE & ABRAMOFF Client Trust Fund; (2) on 2/4/2019, $340,000 to BASE MEDIA TECHNOLOGY GROUP LTD; (3) on 1/16/2019, $3,282,500 to BASE MEDIA TECHNOLOGY GROUP LTD; (4) on 6/26/2018, $300,000 to PRODUCTION CAPITAL LLC; (5) on 12/11/2019, $5,208,000 to BASE FX PRODUCTION SWITZERLAND AG; (6) on 1/2/2020, $60,000 to BASE FX PRODUCTIONS SWITZERLAND AG; (7) on 2/27/2020, $190,000 to BASE FX PRODUCTIONS SWITZERLAND AG; (8) on 3/5/2020, $1,050,000 to BASE FX INTERNATIONAL LIMITED; (9) on 6/2/2020, $449,980 to BASE FX PRODUCTIONS SWITZERLAND AG; and (10) on 6/4/2020, $355,000 to BASE FX INTERNATIONAL LIMITED.

379.    Based on the contractual agreements between Plaintiff WINNERS and Defendant ROBL, the unpaid amount is as follows: (1) BASE DIGITAL SERVICES, LIMITED, $350,000, due on 3/17/2021 with 20% ROI, $70,000; (2) BASE FX INTERNATIONAL LTD, $150,000, due on 3/31/2021 with 20% ROI, $30,000; and (3) BASE FX INTERNATIONAL LTD, $520,000, due on 12/31/2021 with 28% ROI per annum, $145,600.  Total outstanding principle is $1,020,000. Total outstanding ROI is $245,600.  Total amount Defendants owe to Plaintiffs HO and WINNERS is $1,265,600.

380.    As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs have suffered damages in the amount of approximately $40,737,000 plus pre-judgment interest.

381.    Due to the fraudulent conducts, the Defendants are jointly and severally liable to Plaintiffs for the punitive damages, plus the costs of bringing this suit, including reasonable attorney fees.

**TWENTY - SECOND CLAIM FOR RELIEF**

**Improper Recipient**

**(By All Plaintiffs Against Defendants PRODUCTION CAPITAL, FOPC,**

**BASE MEDIA, BASE FX, BASE FX INTERNATIONAL, BASE FX**

**SWITZERLAND, BASE DIGITAL, CHALET FILMS, and FPBS)**

382.    Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 381 of this Complaint for all purposes as though fully set forth herein.

383.    Plaintiffs LIANG and PRICETON wired out funds to several entity Defendants based on Defendant ROBL's instructions.

384.    More specifically, Plaintiffs LIANG and PRINCETON wired their investment funds to the following entity Defendants as Defendant ROBL instructed: (1) on 7/11/2018, $289,983.34 to the BURGEE & ABRAMOFF Client Trust Fund; (2) on 2/4/2019, $340,000 to BASE MEDIA TECHNOLOGY GROUP LTD; (3) on 1/16/2019, $3,282,500 to BASE MEDIA TECHNOLOGY GROUP LTD; (4) on 6/26/2018, $300,000 to PRODUCTION CAPITAL LLC; (5) on 12/11/2019, $5,208,000 to BASE FX PRODUCTION SWITZERLAND AG; (6) on 1/2/2020, $60,000 to BASE FX PRODUCTIONS SWITZERLAND AG; (7) on 2/27/2020, $190,000 to BASE FX PRODUCTIONS SWITZERLAND AG; (8) on 3/5/2020, $1,050,000 to BASE FX INTERNATIONAL LIMITED; (9) on 6/2/2020, $449,980 to BASE FX PRODUCTIONS SWITZERLAND AG; and (10) on 6/4/2020, $355,000 to BASE FX INTERNATIONAL LIMITED.

385.    Based on the contractual agreements that were by Plaintiff WINNERS with Defendant ROBL, the unpaid amount is as following: (1) BASE Digital Services, Limited, $350,000, due on 3/17/2021 with 20% ROI, $70,000; (2) Base FX International Ltd, $150,000, due on 3/31/2021 with 20% ROI, $30,000; and (3) Base FX International Ltd, $520,000, due on 12/31/2021 with 28% ROI per annum, $145,600.  Total outstanding principle is $1,020,000.00. Total outstanding ROI is

1   $245,600.  Total amount Defendants owed to Plaintiffs HO and WINNERS is

2   $1,265,600.

3       386.   Plaintiffs seek relief for improper transferees under Constructive Fraud

4   Common Law Claim and request a declaration that Defendants PRODUCTION

5   CAPITAL, FOPC, BASE MEDIA, BASE FX, BASE FX INTERNATIONAL,

6   BASE FX SWITZERLAND, BASE DIGITAL, CHALET FILMS, and FPBS are

7   the improper recipients of the funds that Plaintiffs sent to them based on Defendant

8   ROBL's instruction.

9       387.   As a direct and proximate result of improperly receiving the funds by

10  the Defendants, and each of them, Plaintiffs are entitled to equitable including full

11  restitution and/or disgorgement of all benefits they have been unlawfully withheld

12  from Plaintiffs as a result of the wrongful acts and fraudulent practices described

13  herein.

14  <center>**TWENTY - THIRD CLAIM FOR RELIEF**</center>

15  <center>**Constructive Fraud**</center>

16  <center>**(By All Plaintiffs Against Defendants ROBL, MOHAMMED, CHASE,**</center>

17  <center>**BREMBLE and PETTA)**</center>

18      388.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1

19  through 387 of this Complaint for all purposes as though fully set forth herein.

20      389.   Due to the fact that Defendants owed a fiduciary duty to Plaintiffs, all

21  fraudulent acts made by Defendants against Plaintiffs constitute constructive fraud.

22      390.   As alleged herein and above, Defendants are liable to Plaintiffs for

23  constructive fraud because (1) they made false misrepresentations to Plaintiffs; (2)

24  the misrepresentations were in reference to material facts; (3) the

25  misrepresentations were made for the purpose of inducing the Plaintiffs to rely on

26  such representation; 4) on which the Plaintiffs did justifiably rely; and (5) which

27  resulted in damages to Plaintiffs.

28

391.   As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs have suffered damages in the amount of approximately $40,737,000 plus pre-judgment interest.

392.   Due to the fraudulent conducts, the Defendants are jointly and severally liable to Plaintiffs for the punitive damages, plus the costs of bringing this suit, including reasonable attorney fees.

## TWENTY - FOURTH CLAIM FOR RELIEF

### Aiding and Abetting

**(By All Plaintiffs Against Defendants ROBL, MOHAMMED, CHASE, BREMBLE, PETTA, PRODUCTION CAPITAL, FOPC, BASE MEDIA, BASE FX, BASE FX INTERNATIONAL, BASE FX SWITZERLAND, BASE DIGITAL, CHALET FILMS, and FPBS)**

393.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 392 of this Complaint for all purposes as though fully set forth herein.

394.   As discussed herein, Defendants ROBL, MOHAMMED, CHASE, BREMBLE, PETTA, committed fraudulent and wrongful acts that causes injury to Plaintiffs.

395.   Defendants PRODUCTION CAPITAL, FOPC, BASE MEDIA, BASE FX, BASE FX INTERNATIONAL, BASE FX SWITZERLAND, BASE DIGITAL, CHALET FILMS, and FPBS knew that Defendants ROBL, MOHAMMED, CHASE, BREMBLE, PETTA, committed fraudulent and wrongful acts against Plaintiffs, which constitute a breach of duty.

396.   Defendants PRODUCTION CAPITAL, FOPC, BASE MEDIA, BASE FX, BASE FX INTERNATIONAL, BASE FX SWITZERLAND, BASE DIGITAL, CHALET FILMS, and FPBS have substantially assisted  Defendants ROBL, MOHAMMED, CHASE, BREMBLE, PETTA in the achievement of the breach.

397.   Since 2016 through present time, there is a pattern of systematic occurrences of the fraudulent activities conducted by Defendants against the general public including against Plaintiffs and other investors.  Many investors including Plaintiffs are victimized by Defendants' Ponzi scheme and racketeering activities. The schemes are well calculated to defraud Plaintiffs and other investors in similar situations.

398.   Defendants acted in accord and carried out the scheme jointly.

399.   As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs have suffered damages in the amount of approximately $40,737,000 plus pre-judgment interest.

400.   Due to the fraudulent conducts, the Defendants are jointly and severally liable to Plaintiffs for the punitive damages, plus the costs of bringing this suit, including reasonable attorney fees.

### TWENTY - FIFTH CLAIM FOR RELIEF

### Civil Conspiracy

### (By All Plaintiffs Against All Defendants)

401.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 400 of this Complaint for all purposes as though fully set forth herein.

402.   The purpose of Defendant ROBL's forming of the multiple entities was carried out to defraud government and individuals by concealing Defendants' violation of Federal and California laws.

403.   With unity of interest and ownership, Defendants collectively formed a dominant group that operates illegal business through mail and wire frauds.

404.   With unity of interest, Defendants were the principals, agents, employees, servants, co-venturers, partners, co-conspirators and/or legal representatives of each of the Defendants and that in doing the things herein alleged, Defendants, and each of them, acted within the course and scope of said

relationships and with the knowledge, permission, consent, ratification and/or adoption of the other Defendants, and each of them.

405.   With the unity as alto ego entities, Defendants, acted in accord, have engaged in the unregistered offering of sale of securities in the form of promissory notes or investment contracts to the general public including Plaintiffs and recruited the funds.

406.   With unity of interest, Defendants misused investor funds after raising at least $300 million from more than 100 investors nationwide and overseas, including Plaintiffs.  Defendants have operated a fraudulent scheme whereby Defendants diverted investor money to false entities and misappropriated investor money for their personal use.

407.   Since 2016 through present time, there is a pattern and systematic occurrences of the fraudulent activities conducted by Defendants against general public including Plaintiffs and other investors. Many investors including Plaintiffs are victimized by Defendants' Ponzi scheme and racketeer activities.  The schemes are well calculated to defraud Plaintiffs and other investors in similar situations.

408.   Defendants acted in accord and carried out the scheme jointly.

409.   As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs suffered damages in the amount of approximately $40,737,000 plus pre-judgment interest.

410.   Due to the fraudulent conducts, the Defendants are jointly and severally liable to Plaintiffs for the punitive damages, plus the costs of bringing this suit, including reasonable attorney fees.

## TWENTY - SIXTH CLAIM FOR RELIEF

## Breach of Contract - Count One

COMPLAINT AND DEMAND FOR JURY TRIAL

**(By Plaintiffs HO and WINNERS Against ROBL, PRODUCTION CAPITAL, FOPC, BASE MEDIA, BASE FX, BASE FX INTERNATIONAL, BASE FX SWITZERLAND, BASE DIGITAL, CHALET FILMS, and FPBS)**

411.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 410 of this Complaint for all purposes as though fully set forth herein.

412.   On March 1, 2019, Defendant ROBL presented Plaintiffs HO and WINNERS an investment agreement in the total amount of $200,000 that was offered by Defendant BASE MEDIA as Securities and was signed by Defendant BASE MEDIA's CEO Defendant BREMBLE and its VP Defendant ROBL.

413.   Plaintiffs have fully performed their obligations pursuant to the terms of the Agreements/Securities by paying the $200,000 to Defendants.

414.   Moreover, on December 16, 2020, January 1, 2021, and March 17, 2021, Defendant ROBL presented Plaintiffs HO and WINNERS three separate investment agreements in the total amount of $1,020,000 that were offered by Defendant BASE MEDIA as Securities and were signed by BASE MEDIA's CEO Defendant BREMBLE and its VP Defendant ROBL.

415.   Plaintiffs have fully performed their obligations pursuant to the terms of the Agreements/Securities by paying the $1,020,000 to Defendants.

416.   The terms of all of the Agreement/Securities are all matured and due. Plaintiff HO and WINNERS' requests for repayment and profit share based on the Agreements/Securities.  However, Defendants failed to honor their obligations based on the agreements and declined to pay Plaintiffs HO and WINNERS.

417.   Based on the contractual agreements between Plaintiff WINNERS and Defendant ROBL, the unpaid amount is as follows: (1) BASE DIGITAL SERVICES, LIMITED, $350,000, due on 3/17/2021 with 20% ROI, $70,000; (2) BASE FX INTERNATIONAL LTD, $150,000, due on 3/31/2021 with 20% ROI, $30,000; and (3) BASE FX INTERNATIONAL LTD, $520,000, due on

- 72 –

12/31/2021 with 28% ROI per annum, $145,600.  Total outstanding principle is $1,020,000. Total outstanding ROI is $245,600.  Total amount Defendants owe Plaintiffs HO and WINNERS is $1,265,600.

418.   Because Defendants breached the contracts they entered with Plaintiffs, Plaintiffs suffered damages in the amount to be proven at trial but no less than $1,265,600.

<div align="center">

**TWENTY - SEVENTH CLAIM FOR RELIEF**

**Breach of Contract - Count Two**

**(By Plaintiffs LIANG and PRINCETON Against Defendants ROBL,**

**BREMBLE, BASE FX, BASE FX INTERNATIONAL, and BASE MEDIA)**

</div>

419.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 418 of this Complaint for all purposes as though fully set forth herein.

420.   Plaintiffs LIANG and PRICETON made several written agreements with Defendants.

421.   On April 15, 2020, Defendant ROBL presented to Plaintiffs an agreement in the total amount of $10,210,500 that were offered by Defendant BASE FX INTERNATIONAL as Securities and were signed by its VP, Defendant ROBL.

422.   Moreover, on January 28, 2019, Defendant ROBL presented to Plaintiff LIANG with an agreement in the total amount of $1,000,000 that were offered by Defendant BASE MEDIA as Securities and were signed by Defendant BASE MEDIA's CEO Defendant BREMBLE.  The agreement offered Plaintiff LIANG 6% of the 36% share that Defendant BASE MEDIA owned in Wish Dragon film project.

423.   Plaintiffs have fully performed their obligations pursuant to the terms of the Agreements/Securities by paying the $10,210,500 and $1,000,000 respectively to Defendants.

424.   Plaintiffs LIANG and PRICETON wired out funds to Corporate Defendants based on Defendant ROBL's instructions.

425.   Plaintiffs LIANG and PRINCETON wired their investment funds to several entities as Defendant ROBL instructed: (1) on 7/11/2018, $289,983.34 to the BURGEE & ABRAMOFF Client Trust Fund; (2) on 2/4/2019, $340,000 to BASE MEDIA TECHNOLOGY GROUP LTD; (3) on 1/16/2019, $3,282,500 to BASE MEDIA TECHNOLOGY GROUP LTD; (4) on 6/26/2018, $300,000 to PRODUCTION CAPITAL LLC; (5) on 12/11/2019, $5,208,000 to BASE FX PRODUCTION SWITZERLAND AG; (6) on 1/2/2020, $60,000 to BASE FX PRODUCTIONS SWITZERLAND AG; (7) on 2/27/2020, $190,000 to BASE FX PRODUCTIONS SWITZERLAND AG; (8) on 3/5/2020, $1,050,000 to BASE FX INTERNATIONAL LIMITED; (9) on 6/2/2020, $449,980 to BASE FX PRODUCTIONS SWITZERLAND AG; and (10) on 6/4/2020, $355,000 to BASE FX INTERNATIONAL LIMITED.

426.   The terms of all of the Agreements/Securities have matured and are due.  Plaintiffs LIANG and PRINCETON request for repayment and profit share based on the Agreements/Securities.  However, Defendants failed to honor their obligations based on the agreements and declined to pay Plaintiffs LIANG and PRINCETON.

427.   Defendants' breach of contract directly and proximately caused Plaintiffs LIANG and PRINCETON to suffer damages will be proven at trial but in no event less than approximately $40,737,000.

## TWENTY - EIGHTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### (By Plaintiffs LIANG and HO Against All Defendants)

428.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 427 of this Complaint for all purposes as though fully set forth herein.

429.   At the same time Defendants began their illegal activities including the conducts of defrauding Plaintiffs' investment funds, Defendants were not acting in good faith while attempting to lure Plaintiffs to invest the funds.  Defendants committed the acts set for above with complete utter and reckless disregard of probability of causing Plaintiffs LIANG and HO to suffer severe emotional distress.

430.   As an actual and proximate cause of Defendants' illegal activities including the conducts of defrauding Plaintiffs' investment funds, Plaintiffs LIANG and HO have suffered severe emotional distress because they have been living under the constant emotional nightmare if losing their investment funds and facing legal consequences from their own investors who also invested funds in the Scheme.

431.   The conduct of Defendants, and each of them, as herein described, was so vile, base, contemptible, miserable, wretched, and loathsome that it would be looked down upon and despised by ordinary people.  Plaintiffs are entitled to punitive damages in an amount appropriate to punish Defendants and deter other from engaging in similar conduct. Defendants' wrongful acts caused Plaintiffs non-economic damages in an amount exceeding $200,000.

## TWENTY - EIGHTH CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress
### (By Plaintiffs LIANG and HO Against All Defendants)

432.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 431 of this Complaint for all purposes as though fully set forth herein.

433.   At the same time Defendants began their illegal activities including the conducts of defrauding Plaintiffs' investment funds, Defendants were not acting in good faith while attempting to lure Plaintiffs to invest the funds.  Defendants committed the acts set for above with complete utter and reckless disregard of probability of causing Plaintiffs LIANG and HO to suffer severe emotional distress.

434.   As an actual and proximate cause of Defendants' illegal activities including the conducts of defrauding Plaintiffs' investment funds, Plaintiffs LIANG and HO have suffered severe emotional distress because they have been living under the constant emotional nightmare if losing their investment funds and facing legal consequences from their own investors who also invested funds in the Scheme.

435.   Defendants' wrongful acts if they were not done intentionally, they were done in neglect.  The wrongful acts caused Plaintiffs non-economic damages in the amount exceeds $200,000.

## THIRTIETH CLAIM FOR RELIEF

**Temporary and Permanent Injunctive relief Pursuant to 18 U.S.C. §2520(b),18 U.S.C. §2707(b), Cal. Code Civ. Proc. §525**

**(Against All Defendants)**

436.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 435 of this Complaint for all purposes as though fully set forth herein.

437.   Plaintiffs seek injunctive relief for a judicial injunction including an Order for Defendants to stop their wrongful and illegal acts against Plaintiffs.

438.   Plaintiffs seek for equitable relief, including an Order for Defendants to stop their wrongful and illegal acts against Plaintiffs.

439.   As direct and proximate result of Defendants conduct as described herein, Plaintiffs have suffered irreparable harm through the illegal Schemes.

440.   Plaintiffs have a substantial likelihood of success on the merits of their claims.

441.   In addition, the magnitude of the injury being suffered due to Defendants' unlawful conduct heavily outweighs whatever hardship Defendants could allege or prove from being restrained as requested.

442.   Moreover, Plaintiffs seek issuance of a temporary restraining order

requiring preservation of all material evidence in Defendants' possession, custody or control would aid in fulfilling the remedial purposes articulated in 18 U.S.C. §2520(c) and 18 U.S.C. §2707(c).

443.    Injunctive relief, as an equitable remedy, is authorized by 18 U.S.C. §2520(b) and 18 U.S.C. §2707(b), and as such Plaintiffs need not demonstrate an irreparable injury or inadequacy of other remedies, but merely show a *prima facie* case of illegality and that an injunction would fulfill the legislative purpose of the statute.

444.    A temporary restraining order and preliminary injunction will fulfill the purposes of these statutes.

445.    At this point, Plaintiffs have no adequate remedy at law and are suffering immediate, imminent, and irreparable harm.  Should Defendants' actions continue unabated, they will continue to harm Plaintiffs' ability to conduct their business and secure repayments for those who invested through Plaintiffs.

446.    Further, a substantial risk exists that in the absence of an appropriate order directing Defendants to preserve material evidence; Defendants will destroy or conceal evidence supporting the claims articulated in this Complaint.

447.    Specific items at risk of spoliation include, but are not limited to: digital storage devices, computer hard drives, files stored on-line, stored e-mail communications, downloaded e-mail communications and any attachments thereto; correspondence or memoranda summarizing the contents of Plaintiffs' e-mail communication and electronic data.

448.    Given that much of the evidence at issue is likely to be in digital format, the risk of loss through inadvertence, accident, or deliberate action is heightened.

449.    In the event that such evidence is lost, mishandled or destroyed, Plaintiffs' ability to establish their claims and damages will be threatened with

1 │ irreparable harm.

2 │     450.   There is reason to believe that in the absence of an immediate

3 │ restraining order restraining the destruction or manipulation of material evidence,

4 │ such items will be destroyed or concealed.

5 │     451.   Issuance of a temporary restraining order requiring Defendants to

6 │ preserve all material evidence in their possession, custody or control would aid in

7 │ fulfilling the remedial purposes articulated in 18 U.S.C. §2520(c) and 18 U.S.C.

8 │ §2707(c).

9 │     452.    Moreover, the granting of the injunctive relief requested herein will

10 │ not adversely affect any public policy or public interest but will instead promote

11 │ same.

12 │     453.   Plaintiffs have not provided advance notice to Defendants of this

13 │ action or the relief sought herein on the grounds that to do so would accelerate the

14 │ risk of destruction of evidence which Plaintiffs are seeking to prevent.

15 │     454.   Unless Defendants are restrained from continuing these unlawful,

16 │ unfair, and fraudulent business acts or practices, Plaintiffs and Plaintiffs' investors

17 │ will suffer irreparable injury.

**THIRTY-FIRST CLAIM FOR RELIEF**

**Declaratory Relief**

**(By All Plaintiffs Against Defendants ROBL, BREMBLE, BASE FX, and BASE MEDIA)**

22 │     455.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1

23 │ through 454 of this Complaint for all purposes as though fully set forth herein.

24 │     456.   The Declaratory Judgment Act permits Plaintiffs to seek declaratory

25 │ relief to resolve this "real and substantial" legal dispute.

26 │     457.   During the period of 2016 through the present time, Defendant ROBL

27 │ presented several agreements offered by BASE MEDIA/BASE FX (the

28 │

- 78 –

Agreements).  The Agreements were signed by BASE MEDIA/BASE FX's CEO Defendant BREMBLE.

458.   After However, Defendants BREMBLE and BASE MEDIA/BASE FX now refused to honor the agreements by denying investors including Plaintiffs' requests for repayment and profit share based on the Agreements.

459.   Defendants BREMBLE, BASE MEDIA/BASE FX disputed the validity of the Agreements.

460.   Plaintiffs seek declaratory relief for the validity of the Agreements signed between Plaintiffs and Defendant BASE MEDIA.

461.   Plaintiffs seek for a Declaration that the Defendants committed the alleged violations of laws.

462.   There is a proper subject of declaratory relief and an actual controversy involving justiciable questions relating to the rights or obligations of the Plaintiffs and Defendants agreed in the Agreements.

## THIRTY-SECOND CLAIM FOR RELIEF

### Piercing Corporate Veil

**(By All Plaintiffs Against Defendants ROBL, MOHAMMED, CHASE, BREMBLE, PETTA, PRODUCTION CAPITAL, FOPC, BASE MEDIA, BASE FX, BASE FX INTERNATIONAL, BASE FX SWITZERLAND, BASE DIGITAL, CHALET FILMS, and FPBS)**

463.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 462 of this Complaint for all purposes as though fully set forth herein.

464.   The purpose of Defendant ROBL's forming of the multiple entities was carried out to defraud government and individuals by concealing Defendants' violations of Federal and California laws.

465.   With unity of interest and ownership, Defendants collectively formed a dominant group that operates illegal business through mail and wire frauds.

466.   With unity of interest, Defendants were the principals, agents, employees, servants, co-venturers, partners, co-conspirators and/or legal representatives of each of the Defendants and that in doing the things herein alleged, Defendants, and each of them, acted within the course and scope of said relationships and with the knowledge, permission, consent, ratification and/or adoption of the other Defendants, and each of them.

467.   With the unity as alto ego entities, Defendants, acted in accord, have engaged in the unregistered offering of sale of securities in the form of promissory notes or investment contracts to the general public including Plaintiff and recruited the funds.

468.   With unity of interest, Defendants misused investor funds after raising at least $300 million from more than 100 investors nationwide and overseas, including Plaintiffs.  Defendants have operated a fraudulent scheme whereby Defendants diverted investor money to false entities and misappropriated investor money for their personal use.

469.   Since 2016 through present time, there is a pattern and systematic occurrences of the fraudulent activities conducted by Defendants against general public including Plaintiffs and other investors. Many investors including Plaintiffs are victimized by Defendants' Ponzi scheme and racketeer activities.  The schemes are well calculated to defraud Plaintiffs and other investors in similar situations.

470.   Defendants acted in accord and carried out the scheme jointly.

471.   Plaintiffs seek for a piercing of corporate veil against Corporate Defendants.

### THIRTY-THIRD CLAIM FOR RELIEF

### Accounting

### (By All Plaintiffs against Defendants BREMBLE, BASE MEDIA, and BASE FX)

472.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 471 of this Complaint for all purposes as though fully set forth herein.

473.   Plaintiffs seek for an accounting against Defendants for a determination of the amount that they owed to Plaintiffs because the exact amount to which the Plaintiffs are entitled is uncertain and cannot be calculated based on the information available to Plaintiffs.

474.   There is a fiduciary relationship between the Plaintiffs and Defendants that demonstrate that Plaintiffs' legal remedies are inadequate without an accounting.  Based on the terms of the agreement made between Plaintiffs and Defendants, Defendants owed 6% of their total income from the proceeds received Wish Dragon film project.  However, Defendants have never paid penny to Plaintiffs and have never provided Plaintiffs any information regarding the amount to that they owed to Plaintiffs.

475.   The exact amount due the Plaintiffs is unknown and cannot be ascertained without an accounting, since the information necessary to determine that amount is within the exclusive knowledge of the Defendants. Therefore, Plaintiffs cannot assert a specific sum due, and there is no legal remedy available.

476.   Since the exact amount of Plaintiffs' damages cannot be readily ascertained, and the facts necessary to determine the exact amount due the Plaintiffs are solely within the knowledge of the Defendants, an accounting to enforce the rights of the Plaintiffs LIANG and HO against Defendants pursuant to the terms of the Agreement is indispensable.

## THIRTY- FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

### (By All Plaintiffs Against All Defendants)

477.   Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 through 476 of this Complaint for all purposes as though fully set forth herein.

478.   As a direct and proximate result of the foregoing conduct, Defendants have been unjustly enriched. Plaintiffs are entitled to full disgorgement of all profits obtained by Defendants as a result of their unlawful, unfair, and fraudulent acts as alleged herein.

### PRAYER

**WHEREFORE,** Plaintiffs PAUL LIANG, THE PRINCETON PROJECT, INC., FANG FANG HO A/K/A FANG HO, and REAL WINNERS, INC., pray for relief as follows:

1. For compensatory damages of approximately $40,737,000 and further damages as to be proven at the time of trial;

2. For special damages;

3. For statutory damages;

4. For punitive and exemplary damages;

5. For attorney fees and costs;

6. For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law;

7. For declaratory relief regarding the validity of each and every agreement signed between Plaintiffs and Defendant BASE MEDIA;

8. For a Declaration that the Defendants committed the alleged violations of laws;

9. For a judgment, in a form consistent with Fed. R. Civ. P. 65(d), temporarily, preliminarily, and permanently enjoining the Defendants and their respective officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order or judgment by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a),

77e(c), and 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

10. For imposition of a constructive trust;

11. For an accounting; and

12. For such other and further relief as the Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all claims and issues so triable.

Dated: March 1, 2022

_____

HELEN W. QUAN, ESQ. (SBN 207361)
ATTORNEY AT LAW
333 W. Garvey Avenue, #B-911
Monterey Park, CA 91754
Tel: (626) 571-2006
Email: helenwq@aol.com

*Attorney for Plaintiffs PAUL LIANG, THE*
*PRINCETON PROJECT, INC., FANG FANG*
*HO a/k/a FANG HO, and REAL WINNERS,*
*INC.*

COMPLAINT AND DEMAND FOR JURY TRIAL